BIANCO, J.T.C.

TABLE OF CONTENTS

I. Introduction......................................75
II. Procedural History................................76
III. Background......................................79
IV. Observations .....................................81
A. Casino hotels are limited-market properties .......85
B. Casino hotels are not conventional hotels..........88
V. Stipulated Facts ..................................91
VI. Analysis .........................................98
VII. The Sands’ Case................................ 103
A. The relationship between more hotel rooms and casino profits................................ 104
B. The ability to compete........................ Ill
C. Management................................ 117
*75 VIII. Determination of Value .......................... 126
A. Tax Year 1996 ............................... 128
B. Tax Year 1997 ............................... 134
C. Tax Year 1998 ............................... 137
D. Tax Year 1999 ............................... 140
Appendix .............................................144
I. Introduction.
This is the court’s determination with regard to property tax appeals filed by both the City of Atlantic City (hereinafter “Atlantic City”) and Ace Gaming, LLC [1] (successor in interest to Create Bay Hotel and Casino, Inc., operating as the Sands Hotel and Casino in Atlantic City, hereinafter the “Sands”), challenging the Sands’ property tax assessments for tax years 1996, 1997, 1998, and 1999.
For tax years 1996 through 1998 the properties under appeal were designated by the taxing district as Block 30, Lot 60, Block 26, Lots 117, 119.02, 191, and 192, Block 163, Lots 8 and 9, and constitute a single economic unit. (See Chart A at page 144 in the Appendix for a more detailed description).
For tax year 1999, block and lot designations for the properties under appeal were changed by the taxing district to Block 47, Lots 12 and 19, Block 48, Lots 8 and 10, Block 49, Lots 10, 11, 19, 20 and Block 274, Lots 16 and 17, and continue to constitute a single economic unit. (See Chart B at page 144 in the Appendix for a more detailed description).
Both sets of the abovementioned block and lot numbers, i.e. those before 1999 and those in 1999, are hereinafter collectively referred to as the “Subject Property.”
*76 For each of the years under appeal the Subject Property was originally assessed at $261,092,000, with $36,325,200 attributed to land, and $224,766,800 attributed to improvements. (See Chart C at page 145 in the Appendix, for the allocation of the total assessment among the specific blocks and lots for tax years 1996 through 1999).
The common level of assessment for each of the tax years in dispute as promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1 — 35(a) to 35(c) (L. 1973, c. 123) is as follows: (1) 1996 — 94.45%, with the upper limit of the common level range being 108.62%, or 100%, see Caulfield v. Surf City Bor., 14 N.J.Tax 118 (Tax 1994), and the lower limit being 80.28%; (2) 1997 — 102.59%, with the upper limit of the common level range being 117.98%, or 100%, ibid., and the lower limit being 87.20%; (3) 1998 — -94.10%, with the upper limit of the common level range being 108.22%, or 100%, ibid., and the lower limit being 79.98%; and (4) 1999 — 102.80%, with the upper limit of the common level range being 118.22%, or 100%, ibid., and the lower limit being 87.38%.
After making a determination of value under the income approach for each of the years under appeal, it is the decision of this court to affirm and reinstate the original assessment of the Subject Property for tax year 1996, to reduce the assessment to $237,722,000 for tax year 1997, to reduce the assessment to $226,409,000 for tax year 1998, and to further reduce the assessment to $208,867,000 for tax year’ 1999. The reasoning for the court’s decision is set forth below.
II. Procedural History.
For tax year 1996, the Sands filed an appeal with the Atlantic County Board of Taxation (hereinafter the “Board”) pursuant to N.J.S.A 54:3-21. After a hearing was held, the Board issued its judgment reducing the Subject Property’s overall assessment to $228,000,000, with $36,039,000 attributed to land, and $191,961,000 attributed to improvements. (See Chart D on page 146 in the Appendix for the specific allocation of the 1996 reduction). Atlantic City appealed to the Tax Court pursuant to N.J.S.A. 54:51A-1, *77 seeking review of Board’s 1996 judgment. The Sands then filed its own appeal with the Tax Court challenging that judgment under that same statute.
For tax year 1997, the Sands initially filed a tax appeal with the Board. Atlantic City, however, filed a direct appeal with the Tax Court seeking to increase the assessment to which the Sands then filed a counterclaim. The appeal before the Board was eventually dismissed,[2] leaving the Tax Court to determine the 1997 appeal.
For tax year 1998, after first filing for bankruptcy protection earlier that year under the Federal Bankruptcy Act (11 U.S.C. §§ 101 to -1501),[3] the Sands filed Adversary Proceedings in the Bankruptcy Court challenging its 1998 tax assessment and, pursuant to 28 U.S.C. § 1452(a), removed the 1996 and 1997 pending appeals to the bankruptcy court.[4] Upon application of Atlantic City, the bankruptcy court “abstain[ed] from exercising jurisdiction over the Adversary Proceedings” and transferred all three matters (1996 through 1998) to the Tax Court of New Jersey.[5]
*78 For tax year 1999,[6] Sands filed a direct appeal to the Tax Court and Atlantic City filed a counterclaim.
At trial in the present matters, the Sands called the following fact witnesses: Timothy Ebling, former Vice-President of Finance and a former Director of the Sands; James Tuthill, Vice-President of Casino Operations at the Sands; Frederick H. Kraus, former General Counsel to the Sands, as well as a former Director; Frank A. Bellis, Jr., former Vice-President, General Counsel and Secretary, and later Chief Executive Office of the Claridge Casino in Atlantic City; and Novelette Hopkins, the current Tax Assessor of Atlantic City, and former Deputy Assistant Assessor.
Mr. Bellis was initially offered as an expert witness in “the difficulties in generally operating ... a casino in the Atlantic City market during the time period, the years operating in that environment, financially, competitively and ... with respect to small, isolated, landlocked, multi-level, low or no amenity facilities,” [Transcript May 10, 2005 at 27, lines 10-25; Id. at 28, line 1] and prepared a report that was offered in evidence. On the objection of Atlantic City, the court refused to accept Mr. Bellis as an expert finding that, (1) his intended expert testimony would not necessarily aid the court, (2) the basis for his proposed expertise was not a recognized discipline, and (8) he did not possess sufficient specialized knowledge to express and explain an expert opinion. State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984). Accordingly, his report was excluded. Mr. Bellis did testify as a fact witness, although his testimony was found to be of minimal relevance and was given little weight by the court.
The deposition testimony of Douglas Stuart, Tax Assessor for the City of Atlantic City during the relevant tax years was read into the record without objection pursuant to N.J.R.E. 804(b)(1)(A) of the Rules of Evidence, as it was represented by counsel for both the Sands and Atlantic City that Mr. Stuart is now incapaci *79 tated and unable to testify directly, and that both parties “had an opportunity ... [during the deposition] ... to develop the testimony by examination [and] cross-examination.” N.J.R.E. 804(b)(1)(A).
The court gave careful consideration to the testimony of all the fact witnesses called by the Sands. As will be apparent in the balance of this opinion, the court found some witnesses and testimony more compelling than others. There were no fact witnesses called by Atlantic City.
Both the Sands and Atlantic City engaged the services of professional real estate appraisers to provide opinions of value of the Subject Property for each of the tax years in dispute. Each appraiser was accepted by the court to testify as an expert and prepared a valuation report which was admitted into evidence (hereinafter referred to as “Sands Report” and “AC Report”). Both experts concluded that the highest mid, best use of the Subject Property is to continue in its current use as a casino hotel with supporting structures.
The Sands’ expert, relying solely upon the income approach, concluded that the value of the real estate of the Subject Property was $132,000,000 for tax year 1996, $105,000,000 for tax year 1997, $95,000,000 for tax year 1998, and $75,000,000 for tax year 1999. In sharp contrast, Atlantic City’s expert, relying primarily upon the income approach, and cross checked by the market (or comparable sales) approach, concluded that the value of the real estate of the Subject Property was $270,000,000 for tax year 1996, $239,000,000 for tax year 1997, $239,500,000 for tax year 1998, and $211,500,000 for tax year 1999. Neither expert used the cost approach to value.
A complete list of all evidence admitted or excluded in the present matters (in full or in part) is set forth beginning at page 146 in the Appendix.
III. Background.
The Sands was constructed by the Greate Bay Casino Corporation between 1978 and 1980 with approximately 32,000 square feet of casino area, 502 rooms, an 850-seat cabaret theater, two *80 gourmet restaurants, and a 400 ear parking garage. The property-opened as the Brighton Hotel and Casino in 1980, and was purchased in 1981 by the Pratt Hotel Corporation which converted it to the Sands.[7] In 1984, the Sands expanded the casino floor area to approximately 50,000 square feet and added a two-story, atrium style food court with eleven food vendors and seating for more than 500 people. In 1987, the Sands completed the construction of an eleven story parking garage.[8]
In the mid-1980’s, the Sands expanded the number of rooms by adding a floor of super suites, and converted existing rooms on the 17th, 18th and 19th floors to deluxe rooms as part of the Plaza Club. The Plaza Club was designed to cater to the high-end gaming patron by providing a variety of amenities in a luxurious environment. In 1990, the administrative offices were moved out of the casino hotel building and into the former Jefferson Hotel building, allowing the hotel to be expanded to its current number of 532 rooms.
In 1993 and 1994, the Sands expanded its gaming area from approximately 50,000 square feet to approximately 75,000 square feet. For the tax year's under appeal the total floor area of the Sands for all uses is 628,000 square feet. Also in 1994, management decided to implement a phased introduction of the “Hollywood” theme to the entire casino hotel facility. However, for various reasons, this project was never realized.
At the end of 1995, the management team of William Weidner, Brad Stone and Robert Goldstein, who were respectively the CEO, President, and Vice-President in charge of marketing, left the Sands after about thirteen years of service, to undertake the *81 lead in the creation of the Venetian Casino Resort in Las Vegas. Leonard DeAngelo was appointed to replace Brad Stone as president of Greate Bay Hotel and Casino Inc. which was the entity that owned the Sands.
In June of 1996, the Sands announced a $150 million plan that would include an additional 500 rooms. However, the entire Atlantic City Casino Industry experienced a decline in revenue in 1996 due in part to the harsh winter conditions in January and February of that year. The Sands was particularly hard hit; it never rebounded from the winter revenue decline, and experienced further set backs in 1996 resulting from a promotional experiment with the odds on crap tables that failed (discussed more fully in Section VIT C of this opinion). Subsequently, the Sands abandoned its plans to add the additional 500 rooms.
In 1997, the Pratt Hotel Corporation changed its name to Greate Bay Casino Corporation. Greate Bay Casino Corporation is the parent of Greate Bay Hotel and Casino, Inc. On January 5, 1998, Greate Bay Hotel and Casino, Inc. (i.e. the Sands), together with other related entities, filed for bankruptcy protection. Also in 1998, the Sands and Claridge constructed a one way People Mover for the joint use of both casino hotels that connected each facility to the boardwalk. The People Mover is an elevated, enclosed motorized walkway located above Brighton Park. In 2000, the Sands acquired property encompassing approximately one acre with frontage on Pacific Avenue. This acquisition facilitated the construction of a new five bay bus terminal. In 2004, Ace Gaming, LLC became the successor in interest to Greate Bay Hotel and Casino, Inc.
IV. Observations.
This is a case of first impression. Since the inception of legalized casino gambling in Atlantic City in 1978,[9] no published opinion of any New Jersey court has addressed the issue of how to value a casino hotel for tax assessment purposes.
*82 Just a handful of reported cases throughout the country have been found that address to some extent, the valuation of casino property. The state of Nevada, with a tradition of legalized casino gambling dating to 1931, currently requires by statute that:
|a]ny person determining the taxable value of real property shall appraise ... [a]ny improvements made on the land by subtracting from the cost of replacement of the improvements all applicable depreciation and obsolescence.
[Nev.Rev.Stat. Ann. 361.227(1)(b) (2005) (emphasis added).] [10]
In Imperial Palace, Inc. v. State of Nevada, Dep’t Taxation, 108 Nev. 1060, 843 P.2d 813 (1992), the Nevada Supreme Court affirmed the valuation of Imperial Palace casino hotel pursuant to Nev.Rev.Stat. Ann. 361.227(1)(b) (2005), although the cost approach to value prescribed by that statute was not specifically at issue in that case.[11]
In Missouri, the Supreme Court affirmed the assessor’s valuation of a land based casino (no attached hotel) and a riverboat casino pursuant to the cost approach to value, although it was the highest and best use of the subject property therein and not the valuation method at issue in that case. See Snider v. Casino Aztar/Aztar Mo. Gaming Corp., 156 S.W.3d 341 (Mo.2005).
*83 Finally, in Indiana, the Tax Court affirmed the constitutionality of Ind.Code Ann. § 6-1.1-15(5) (1997) (amended 2003) which classified a riverboat casino as real property for purposes of taxation, but reversed and remanded the Indiana Board of Tax Review’s award of physical depreciation and the amount of obsolescence as components of the cost approach to value, although the method of valuation itself was not at issue in the case.[12] See Majestic Star Casino, LLC v. Blumenburg, 817 N.E.2d 322 (Ind.Tax 2004).
No published Federal court decision or any other published state court decision has been found by this court or proffered by the litigants on this issue.
While New Jersey courts have not addressed the valuation of casino hotels for tax assessment purposes, some have made several astute and helpful observations. The Tax Court of New Jersey observed in City of Atlantic City v. Atlantic County Board of Taxation, 2 N.J.Tax 30 (Tax 1980), aff'd per curium, 4 N.J.Tax 685 (App.Div.1982), certif. denied, 93 N.J. 250, 460 A.2d 659 (1983), that:
Atlantic City is unique. Of all of the 567 municipalities in the State of New Jersey [since reduced lo 566], it is the only municipality mentioned by name in the Slate Constitution. N.J. Const. (1947) Art. IV, § VII, par. 2D. The financial well-being of the city is also of the utmost importance not only to the city itself and to its taxpayers, but to the county, the region and to the entire State.
[City of Atlantic City, supra, 2 N.J.Tax at 43 (emphasis added).]
In making this observation, the Tax Court relied upon New Jersey constitutional and statutory authority. New Jersey’s Constitution provides that:
*84 It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries ... of the city of Atlantic City ...
[N.J. Const, art. IV, § 7,¶ 2 (emphasis added).]
As permitted by the constitution, New Jersey’s legislature adopted the Casino Control Act (N.J.S.A 5:12-1 to -210; hereinafter the “Act”), which authorized “legalized casino gaming ... as a unique tool of urban redevelopment for Atlantic City,” N.J.S.A. 5:12-1(b)(4) (emphasis added), finding that:
the introduction of a limited number of casino rooms in major hotel convention complexes, permitted as an additional element in the hospitality industry of Atlantic City, will facilitate the redevelopment of existing blighted areas and the refurbishing and expansion of existing hotel, convention, tourist, and entertainment facilities; encourage the replacement of lost hospitality-oriented facilities; provide for judicious use of open space for leisure time and recreational activities; and attract new investment capital to New Jersey in general and to Atlantic City in particular.

[Ibid.]

In City of Atlantic City v. Ginnetti, 17 N.J.Tax 354 (Tax 1998); aff'd 18 N.J.Tax 672 (App.Div.2000), “another [1996 property tax appeal] involving the valuation of casino related property [in Atlantic City],” City of Atlantic City v. Boardwalk Regency Corp., 19 N.J.Tax 164, 191 (App.Div.2000), the Tax Court recognized the unique nature of Atlantic City as discussed in City of Atlantic City v. Atlantic County Board of Taxation, supra, and further observed that:
[t]his unique nature [of Atlantic City] imposes on litigants, lawyers and on the Tax Court itself, difficult valuation issues. The real estate market in Atlantic City does not necessarily behave in the same manner as real estate markets behave in other localities.
[Ginnetti, supra, 17 N.J.Tax at 360 (emphasis added).]
However, the court recognized that:
[it] must use the information that has been presented ... by way of facts and expert opinion to ultimately fix the assessable values of the subject properties[,]
[Id. at 361.]
finding “it ... not unusual for property which is difficult to value to be assessed. See, e.g., Hackensack Water Company v. Borough of Old Tappan, 77 N.J. 208, 390 A.2d 122 (1978).” Ginnetti, supra, 17 N.J.Tax at 361, citing Cigolini Associates, v. Fairview, 208 N.J.Super. 654, 665, 506 A.2d 811 (App.Div.1986) (emphasis *85 added). The court further observed in Ginnetti that irrespective of the unique and difficult valuation issues presented by the casino-related property in Atlantic City, the Tax Court was “admonished by the Supreme Court to find value.” Id. at 361, citing Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 310-14, 604 A.2d 580 (1992).
In Board,walk Regency Coup., the Appellate Division recognized the Tax Court’s “excellent ‘feel’ for and understanding of the unique nature of [the casino] market and industry,” Boardwalk Regency Corp., supra, 19 N.J.Tax at 191 (emphasis added), and applied the observations made in Ginnetti with “equal force,” finding that those observations demonstrate:
[an] understanding and sensitivity to the vicissitudes of the unique Atlantic City real estate market and the impact of the casino industry on such market, [and] the expertise of the Tax Court in dealing with the complex issues presented here.
[Boardwalk Regency Corp., supra, 19 N.J.Tax at 191 (emphasis added).]
The insightful observations of the Atlantic City real estate market and casino related properties offered by these earlier court decisions provide much welcomed guidance as this court approaches the novel issue now before it. Here too, as in Boardwalk Regency Corp., supra, these observations are applied with “equal force,” id. at 192, to which this court adds the following observations of its own:
A. Casino hotels are limited-market properties.
The Appraisal Institute, The Appraisal of Real Estate 25 (12th ed.2001) defines a limited-market -property as “a property that has relatively few potential buyers at a particular time.” “However, this is not to imply that they have no market value.” [13] The Appraisal Institute, The Appraisal of Real Estate 25 (11th *86 ed.1996). “The distinction between market properties and limited-market properties is subject to the availability of relevant market data.” [14] The Appraisal Institute, The Appraisal of Real Estate 26 (12th ed.2001). “If a market exists for a limited-market property, the appraiser must search diligently for whatever evidence of market value is available.” Ibid.
A Special-purpose property (also called special design property ) is defined in The Appraisal of Real Estate as:
[a] limited-market property with a unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built ...
[The Appraisal Institute, The Appraisal of Real Estate 25 (12th ed.2001).]
See also Westinghouse Electric Corp. v. Bloomfield Tp., 9 N.J.Tax 92, 98-99 (Tax 1985).
In Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242 (Tax 1993), aff'd, 15 N.J.Tax 190 (App.Div.1995), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995), the Tax Court used the terms special-use property and special-purpose property interchangeably finding that:
[t]here is a distinction between truly special-use property (also called special-purpose) and limited-market property. The term ‘special-use’ excludes property for which there is a market. However, "limited-market property is not necessarily special-use property. If a reasonably active, albeit limited, market is shown to exist, the property is not appropriately characterized as special-use or purpose. See Albritton, Valuation of Special-use Property Types, XLVIII The Appraisal Journal 367 (July 1980).” Shulton, Inc. v. Clifton, 7 N.J.Tax 208, 217 (Tax 1983), aff'd 7 N.J.Tax 220 (App.Div.1984).
[Coastal Eagle, supra, 13 N.J.Tax at 257 (emphasis added).]
In Ginnetti, the Tax Court determined that:
it is difficult to find comparable sales of property in Atlantic City, ... because of zoning considerations, proximity to existing casino-hotels, the city infrastructure, and the broad spectrum of sellers and buyers who have participated in the real estate market in Atlantic City, as either developers or speculators, since the inception of gambling in 1978____Therefore, in many instances, there is a dearth of comparable sales for valuing property in Atlantic City.
*87 [T]he valuation of real property in Atlantic City is a unique process, given the, nature of the market,, the sometimes limited number of sales for comparison purposes and the extraordinary financing arrangements which characterize almost every sale of casino-related property in the city.
[Ginnetti, supra, 17 N.J.Tax at 360-62 (emphasis added).]
The absence of an actual market does not mean that a property may escape taxation. See De Luz Homes, Inc. v. County of San Diego, 45 Cal.2d 546, 563, 290 P.2d 544, 555 (1955), Cigolini Associates v. Fairview, 208 N.J.Super. 654, 506 A.2d 811 (App.Div.1986); see also General Motors Corp. v. Linden City, 22 N.J.Tax 95, 121-22 (Tax 2005) (citing Colonial Life Insurance Co. of America v. State Board of Tax Appeals, 126 N.J.L. 126, 129, 18 A.2d 625 (1941)) (holding, “[t]he fact that the property, due to abnormal conditions, is not salable on the assessment date ... is not conclusive of the issue [of the proper assessment amount]”); and Turnley v. City of Elizabeth, 76 N.J.L. 42, 44, 68 A. 1094 (1908) (rejecting the circumstance where “a citizen by the erection of a residence so costly that no one could buy it would escape all taxation, [finding that such a result] is obviously not the intent of the Legislature ... ”).
The Sands’ expert identified a total of just thirteen casino hotels in New Jersey since the inception of casino gambling in Atlantic City (there are currently twelve). He only utilized the income approach to value asserting in his testimony that there was not enough market data to do a sales approach. However, the Sands’ expert did utilize the sales approach to value in his appraisal report of the Trop World Casino Hotel as of October 1, 1994 (admitted into evidence in the present matter as exhibit AC-69), but indicated therein that “[s]ales of ‘stand alone’ casino hotels are infrequent ... in Atlantic City.” (AC-69, p. 119)
Atlantic City’s expert did utilize a sales approach to value in addition to an income approach. He identified seven sales (over an eleven year period from 1985 to 1996) for his sales analysis to which he made no adjustments, according to his testimony, because there were too many variables and differences between the properties.
*88 In view of the expert opinion and testimony in this matter, and considering the above cited case law and appraisal treatise, this court concludes that casino hotels are limited-market properties, but not special purpose, use or design properties.[15]
B. Casino hotels are not conventional hotels.
The Act defines a “casino”[16] as:
One or more locations or rooms in a casino hotel facility that have been approved by the [Casino Control] commission for the conduct of casino gaming' in accordance with the provisions of [the Act]. “Casino”... shall not include any casino simulcasting facility authorized pursuant to the “Casino Simulcasting Act,” P.L.1992, c. 19 (C. 5:12-191 et seq.).
[N.J.S.A. 5:12-6]
A “casino hotel” or “casino hotel facility”[17] is defined under the Act as:
A single building, or two or more buildings which are physically connected in a manor deemed appropriate by the [Casino Control] commission, containing' an approved hotel, a casino and, if applicable, a casino simulcasting facility.
[N.J.S.A. 5:12-19]
The term “hotel” has been defined under various New Jersey statutes. Under the Act, a “hotel” or “approved hotel” is defined as:
[a] single building, or two or more buildings which are physically connected in a manner deemed appropriate by the [Casino Control] commission and which are operated as one casino-hotel facility under the provisions of the [Act], located within the limits of the city of Atlantic City as said limits were defined as of November 2, 1976, and containing not fewer than the number of sleeping units required by section 83 of [the Act], each of which sleeping units shall: a. be at least 325 square feet measured to the center of the perimeter wails, including bathroom and closet space and excluding hallways, balconies and lounges; b. contain private *89 bathroom facilities; and c. be held available and used regularly for the lodging of tourists and convention guests.
[N.J.S.A 5:12-27]
Under the Hotel and Multiple Dwelling Law (N.J.S.A 55:13A-1 to -28), the term “hotel” is defined as:
any building, including but not limited to any related structure, accessory building, and land appurtenant thereto, and any part thereof, which contains 10 or more units of dwelling space or has sleeping facilities for 25 or more persons and is kept, used, maintained, advertised as, or held out to be, a place where sleeping or dwelling accommodations are available to transient or permanent guests.
[N.J.S.A. 55:13A-3(j)]
Finally, under the Sales and Use Tax Act (N.J.S.A. 54:32B-1 to - 53), the term “hotel” is further defined as:
A building or portion of it which is regularly used and kept open for the lodging of guests. The term “hotel” includes an apartment hotel, a motel, boarding house or club, whether or not meals are served.
[N.J.S.A. 54:3215-2(j)]
While the court finds these statutory definitions of casino hotel and hotel to be compatible, the trial testimony and evidence reveal that the nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel. The court found Mr. Ebling’s testimony particularly compelling with regard to the nature of the casino business; he stated that:
The easiest way to break down a customer in Atlantic City is into three categories. There’s the mass category, the mid-level category and the high end category ... The mass tends to lose .. less per trip. The mid loses a little bit more than that per trip and the high [end] loses a lot per trip.
|E]very [betting] decision [a customer has to make] is a potential wm. So, if you deal your hand slow at a table, you have less decisions, that person’s only going | to I be there for a certain period of time, and therefore, that person may -not be able to lose all the money he or she is willing to lose because the dealer is coming out slower ...
A high level [or] a high end player is a player who’s, in most cases, a lot more skilled than a mid to low level player. Occasionally we had a few high end players who weren’t that skilled and we liked them even, more . .
So. when you’re dealing with high end play, you’re dealing with a bit of a higher risk of loss than when you’re dealing with what you would call the grind play. Grind, [i.e.] The day to day person .. who would want to come and lose ... $100 eat at the buffet and go home. They're [the] hind of people that we like, too, but that’s another story, but the high level player, the high end play has a higher risk. [Transcript May 3, 2005 at 101, lines 14-23; Id. at 113, lines 24-25; Id. at 114, lines 1-4; May 4, 2005 at 75, lines 20-25; Id. at 76, lines 1-14 (emphasis added).]
*90 At least one industry analyst has indicated that “more money is spent on gaming and wagering than on the movie, record, and video-game industries combined.” Harold L. Vogel, Entertainment Industry Economics: A Guide for Financial Analysis 276 (Cambridge University Press 1988).[18] Furthermore, casinos generate more revenue than other forms of legalized gambling[19] that reaches into the billions of dollars annually.[20]
Looking beyond the nature of the casino industry as described by Mr. Ebling above, the court cannot ignore that the financial success of legalized gambling in New Jersey has resulted in significant additional tax revenues to state and local governments, while also stimulating the redevelopment of Atlantic City and helping to revitalize its economy. According to the Sands’ expert in his report,
billions of dollars have been invested in Atlantic City to create casino hotels, related support facilities and the services required for a resort and gambling destination ... [Ciasino gambling had a major impact on the development of Atlantic City.
[Sands Report at 25.]
*91 Later in his report, the Sands’ expert addresses the differences between a casino hotel and a conventional hotel. He wrote that:
[u]nlike hotel properties, which can generate 60% to 99% of its income from the rental of rooms, casino-hotels derive more than 90% of its income from gaming. In most instances the income derived from room rentals is less than 5% to 10% of total revenue and most of that revenue is given away in the form of a complimentary to patrons.
[Sands Report at 114.]
The Tax Court has held that “a hotel is a labor intensive business requiring a high degree of management expertise.” Glenpointe Associates v. Teaneck, 10 N.J.Tax 380, 390 (Tax 1989). Similarly, the Sands’ expert opined that:
Casino-hotel resorts are complex enterprises requiring intensive management and the coordination of extensive personnel.
[Sands Report at 138.]
He added, however, that:
the Sands [is] more difficult to manage than a good quality business hotel, because the casino hotel operations are far more complex than those found in conventional hotels.
[Id. at 140.]
The Sands’ expert further noted that “[a]ll of the cash flow fin a casino hotel] is derived from short-term transactions,” Sands Report at 138, and that:
revenue and profits in a casino hotel are far more volatile than in a conventional hotel since casino operations involve elements of luck, seasonality and the sheer magnitude of the dollars.
[Id. at 138.]
Mr. Ebling’s testimony described the casino hotel industry in a way that could never be confused with the operations of a conventional hotel. The report of the Sands’ expert further contrasts the differences between the two industries. Accordingly, the court finds that a casino hotel is not a conventional hotel.
V. Stipulated Facts.
Both the Sands and Atlantic City have stipulated to the facts set forth in this section. The definitions of various terms included in this section, however, have not been stipulated to but rather are derived from the New Jersey Statutes and the Administrative Code, or are definitions of terms utilized in the gaming industry, which have been adopted by the court and, unless otherwise *92 indicated, are set forth in full in the Appendix beginning at page 147. The stipulated facts are as follows:
The Sands’ casino hotel (as defined above in N.J.S.A. 5:12-19) consists of 20-story structure,[21] with the first four floors devoted to gaming areas, dining/restaurant areas, entertainment and the hotel lobby area. The first floor of the Subject Property consists of a Casino Area, as well as the Island Club, Lobby, Gift Shop, Hard and Soft Count Rooms, and Cashier stations. The Mezzanine consists of liquor storage, surveillance and security areas. The second floor consists of a Casino area, the Copa Lounge, Medici’s Restaurant, Brighton Steak House, China Moon Restaurant, and the Copa Showroom/Theater. The third floor consists of Rossi’s Café, Main production kitchen, Room service kitchen, Epic Buffet, Hollywood Store, and The Skylight Ballroom. The fourth floor consists of the Paradise Café, a meeting room, employee lockers, coffee shop, and two small kitchens.[22]
The total number of hotel rooms is 532 for tax years 1996 through 1999. The hotel rooms are located in the upper sixteen floors (fifth through twentieth floors) of the casino hotel with the high end rooms on the upper-most four floors. The nineteenth floor consists of Players Club rooms and guest hotel rooms. The twentieth and twenty-first floors consist of the spa and salon with men’s and women’s locker rooms, saunas, steam rooms, showers, weight room and beauty salon, suites, and super suites.
The administration building is a nine-story office building located at 134-140 Kentucky Avenue.
The land area of the print shop building is approximately .44 acres with frontage on North Texas Avenue.
The casino hotel lot (Block 30 Lot 60 for tax years 1996 through 1998; Block 47 Lot 12 for tax year 1999) fronts on both Indiana Avenue and Dr. Mai'tin Luther King Jr. Boulevard (formally *93 Illinois Avenue) and (for the years under appeal) is set back from Pacific Avenue[23] between 86 and 200 feet. The land area of the casino hotel lot and support property (including air rights parcels but excluding the print shop building), is approximately 4.5 acres, and contains a 24 foot wide easement along the southerly border of the site between Dr. Martin Luther King Jr. Boulevard and Indiana Avenue, which easement is owned by Atlantic City.
For all tax years at issue, the number of available parking spaces is 1,738 all located within an eleven story parking garage. Both parking garage lots (Block 26 Lots 191 and 192 for tax years 1996 through 1998; Block 48 Lot 10 and Block 49 Lot 10 for tax year 1999) are generally situated between Dr. Martin Luther King Jr. Boulevard and Kentucky Avenue. One of the parking garage lots (Block 26 Lot 191 for tax years 1996 through 1998; Block 48 Lot 10 for tax year 1999) fronts on Dr. Martin Luther King Jr. Boulevard and Mt. Vernon Avenue, and the other (Block 26 Lot 192 for tax years 1996 through 1998; Block 49 Lot 10 for tax year 1999) fronts on Mt. Vernon Avenue and Kentucky Avenue. The parking garage access (Block 26 Lot 117 for tax years 1996 through 1998; Block 48 Lot 8 for tax year 1999) is located along both Dr. Martin Luther King Jr. Boulevard and Mt. Vernon Avenue.
The total area of the casino (as defined above in N.J.S.A. 5:12-6) is 53,192 square feet for tax year 1996, 53,427 square feet for tax year 1997, 57,812 square feet for tax year 1998, and 57,296 square feet for tax year 1999. The simulcasting facility (as defined by N.J.S.A. 5:12-44.1) is 22,962 square feet for tax year 1996, 22,962 square feet for tax year 1997, 15,447 square feet for tax year 1998, and 15,963 square feet for tax year 1999. The total gaming area (i.e. casino and simulcasting facility) is 76,154 square feet for tax year 1996, 76,389 square feet for tax year 1997, 73,259 square feet for tax year 1998, and 73,259 square feet for tax year 1999.
*94 The number of slot machines (as defined in N.J.S.A 5:12-45) is 2,022 for tax year 1996, 2,016 for tax year 1997, 2,076 for tax year 1998, and 2,025 for tax year 1999. The number of table games (as defined in N.J.A.C. 19:40-1.2(b)) is 126 for tax year 1996, 122 for tax year 1997, 123 for tax year 1998, and 99 for tax year 1999. The number of keno booths (see N.J.A.C. 19:45-1.47) is four for tax years 1996,1997, and 1998, and none for tax year 1999.[24]
The actual total gaming revenue[25] (from slot machines, table games, simulcasting, and keno) is $264,048,000 for tax year 1996, $242,889,000 for tax year 1997, $234,477,000 for tax year 1998, and $219,368,000 (from slot machines, table games, and simulcasting only) for tax year 1999.[26]
*95 For purposes of the parties’ respective income approaches, the stipulated deduction for a management fee is 4% of net revenue, for tax years 1996 through 1999.
The reserve allowance for furniture, fixtures, and equipment (hereinafter “FF & E”) and short-term life real estate (“Return of Personalty”) is $7,350,000. Instead of taking an above the line deduction for Return on Personalty the parties agreed to deduct the following value attributable to the FF & E for each of the years at issue as a lump sum, after capitalization of net operating income. Accordingly, the value of FF & E is $24,850,000 for tax year 1996, $24,750,000 for tax year 1997, $20,950,000 for tax year 1998 and $20,550,000 for tax year 1999.
Finally, for all tax years at issue herein, the Sands and Atlantic City stipulate that the coat approach to value is not applicable.
The Court has reviewed the foregoing stipulations and finds them to be reasonable with one exception: the applicability of the cost approach to value in the present matters. The court’s reasons for rejecting this one stipulation are as follows:
Neither expert valued the subject property pursuant to the cost approach to value citing a stipulation between the attorneys for the parties not to use the cost approach in these appeals. According to the testimony of Atlantic City’s expert, he considered all thi-ee approaches to value and, after he “thought about it for a couple of days,” he agreed with the stipulation not to use the cost approach explaining that “once ... the [casino] hotel gets to be five or six years old, I think a cost approach becomes I wouldn’t say irrelevant, but l think [it] becomes speculative ...” He concluded that “I don’t think [excluding the cost approach] limited my report to the extent where the conclusion was not reliable.”
*96 The Sands’ expert similarly testified that even though he “wasn’t a party to the stipulation [excluding the cost approach] ... [he] ... didn’t have any big problem [with it].” He explained that as the taxpayer’s expert appraiser in the Tropicana Casino Hotel tax appeal that ultimately settled,[27] “I thought that the cost approach provided the clearest and brightest line between the business and the real estate.” With the Sands, however, he indicated that there would be significant depreciation, and concluded “the cost approach is most useful ... when you don’t have a lot of depreciation to measure.” Both experts concluded that the cost approach would not provide the best indication of value in the present matters.
When the current tax appeals were before another Tax Court Judge, the Case Management Order dated June 8, 2004, provided the opportunity for Atlantic City to “notify the Court and counsel for the taxpayer on or before June 7, 2004 as to whether or not it intends to incorporate a cost approach in its appraisal report.” The same Order later indicates that “[a]t the conference call on June 8, 2004 the City of Atlantic City represented that it WOULD NOT use the cost method in its valuation of the subject property.” Nowhere in the aforementioned Case Management Order does the court or counsel acknowledge that the cost approach to value is inapplicable. Furthermore, in his testimony, the Sands’ expert specifically denied that stipulating to no cost approach in the present matters, implied that the cost approach is not appropriate in a casino tax appeal.
The Tax Court has held that:
consideration should be given, to all three approaches to value, even if one assumes the property to be special purpose in character. There is no doctrinaire approach to value. New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 543-544 [189 A.2d 702] (1963); Brockway Glass Company v. Freehold Tp., 10 N.J.Tax 356, 371 (Tax Ct.1989).
[Glen Pointe Associates, supra, 10 N.J.Tax at 389; see also General Motors Corp., supra, 22 N.J.Tax at 127.]
*97 The .. use of the market value approach for large limited market property [is not precluded], so long as there is a reasonably active market therefor, and it does not compel the use of the cost approach to value. Dworman v. Tinton Falls, 1 N.J.Tax 445 (1980), aff'd o.b. 190 [180] N.J.Super. 366, 3 N.J.Tax 1 (App.Div.1981), certif. den., 88 N.J. 495 [443 A.2d 709] (1981).
[Shulton, Inc. v. Clifton, 7 N.J.Tax 220, 223 (App.Div.1984).]
However,
The cost approach may best reflect how the market operates in those circumstances where other “market" data, that is, comparable sales or leases, are scarce or nonexistent. A prospective purchaser of a property will not abandon a transaction because sales or leases of comparable properties are few in number or not available. The purchaser would consider any available comparable sales or leases, but, in accordance with the theory of the cost approach, also would consider the cost of acquiring suitable land, based on comparable land sales, and the cost of constructing a similar facility. The purchaser then would subtract estimated depreciation and obsolescence to determine an appropriate price for the limited market property. In the marketplace, therefore, in the absence of comparable sales or leases, or where only a limited number of sales and leases are, comparable, the cost approach becomes the primary approach, or at least one approach, used to determine the market price. To reject categorically the use of the cost approach in these circumstances is to reject what actually occurs in the marketplace. If the cost approach cannot be used to value a linated-market property in a tax appeal proceeding, the choice for a court ni deciding the appeal becomes one of determining mine based on potentially inadequate or flawed data or simply affirming the assessment. Neither alternative is preferable to a careful, proper use of the cost approach.
[General Motors Corp., supra, 22 N.J.Tax at 129 (emphasis added).]
In IV A above, this court addressed the limited nature of the market for casino properties. Therefore, “where [as in the present matters] only a limited number of sales and leases are comparable, the cost approach becomes the primary approach, or at least one approach, used to determine the market price.” General Motors Corp., supra, 22 N.J.Tax at 129. Furthermore, this court concluded in IV B above, that a casino hotel is not a conventional hotel. Accordingly, while the Tax Court in Glen Pointe Associates, supra, found that “the income approach is a viable method of appraising hotels and in many cases is given the greatest weight,” Glen Pointe Associates, supra, 10 N.J.Tax at 390, this is not necessarily the case for casino hotels.
While careful consideration has been given to the conclusions of value proffered by the experts based upon the valuation methods they utilized, the court cannot and will not accept by *98 stipulation or otherwise, that the cost approach to value is inapplicable in this case or any other tax appeal involving casino hotel property. Despite their professed acquiescence to the stipulation, both experts’ testimony indicates that they at least gave some consideration to all three approaches to value. With regard to the cost approach to value in the present matters, this court is only willing to accept that neither party ultimately opted to utilize that approach.
VI. Analysis.
There is a presumption of correctness in favor of the Board’s aforementioned 1996 judgment, which can be “overcome by sufficient competent evidence of true value of the property.” Borough of Rumson v. Haran, 3 N.J.Tax 590, 592 (Tax 1981). Similarly, there is a presumption of validity that attaches to the 1997, 1998, and 1999 assessments,[28] Glen Wall Associates v. Wall Twp., 99 N.J. 265, 491 A.2d 1247 (1985), which also may be overcome “by offering evidence of the true value of the property ‘based on sound theory and objective data, rather than on mere wishful thinking.’ ” West Colonial Enterprises, LLC v. City of East Orange, 20 N.J.Tax 576, 578 (Tax 2003), citing MSGW Real Estate Fund, LLC v. Mountain Lakes Bor., 18 N.J.Tax 364, 376 (Tax 1998); aff'd 21 N.J.Tax 590 (App.Div.2004). See also Aetna Life Insurance Co. v. City of Newark, 10 N.J. 99,105, 89 A.2d 385 (1952), Pantasote Co. v. Passaic, 100 N.J. 408, 417, 495 A.2d 1308 (1985).
This presumption of validity stands even though the court is unable to precisely ascertain how the Tax Assessor, Mr. Stuart arrived at the assessment of the Subject Property for each of the tax years under appeal. See Pantasote Co. v. Passaic, supra, 100 N.J. at 417, 495 A.2d 1308, (finding that “the Tax court must give weight to the presumption of validity that attaches to the original assessment.”). Neither the Tax Assessor’s deposition testimony nor the testimony of his then Deputy Assessor, Ms. Hopkins *99 provided the court with any further insight as to how Mr. Stuart assessed the Subject Property.
Just as in Ginnetti, this court is faced with “an extraordinary difference in opinion between the experts ... [who are both] ... experienced appraisers ... [and] had available to them the same information by way of discovery.” Ginnetti, supra,, 17 N.J.Tax at 361. It is well settled that:
[T]he Judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. The weight and value of expert testimony are for the trier of the facts. An expert’s opinion may he adopted in whole or in part, or completely rejected.
[Id. at361-62 (citations omitted) (emphasis added).!
Given that the valuation of a casino hotel has never before been addressed by any published New Jersey court opinion, this court is not certain why counsel would agree not to use the cost approach to value in this matter, and why both expert appraisers would acquiesce in that agreement. This is particularly so considering that Nevada, Missouri, and Indiana, by statute and/or case law, have already determined that the cost approach is a viable method of valuing casino property.[29]
In Snider, supra, the Missouri Supreme Court addressed the “the proper standard for appraising the real and personal property of a gambling casino for tax purposes,” Snider, supra, 156 S.W.3d at 345, and to that end, evaluated the applicability of each valuation method (i.e. the comparable sales (or market) approach, the income approach, and the cost approach, to value).
The Missouri Supreme Court determined that:
[t]he cost approach is most appropriate when the property being valued has been recently improved with structures that conform to the highest and best use of the property or when the property has unique or specialized improvements for which there are no comparables in the market,.
While reproduction cost is the best indicator of value for newer properties ..., replacement cost may be more appropriate for older properties [like the Sands].
*100 [Snider, supra, 156 S.W.3d at 347 (citations omitted).]
Missouri’s case law is consistent with New Jersey’s in that
[t]he cost approach may best reflect how the market operates in those circumstances where other “market” data, that is, comparable sales or leases, are scarce or non-existent.
[General Motors Carp., supra, 22 N.J.Tax at 129.]
Under the comparable sales approach the Missouri Supreme Court concluded that since the subject casino property was a special use property the comparable sales approach “is not appropriate.” Snider, supra, 156 S.W.3d at 348. In contrast, this court has concluded in section IV A above that casino hotels are limited market properties and not special use, design, or pin-pose properties. As a limited market property, the comparable sales approach would be applicable to valuing a casino hotel if comparable market data is available. Coastal Eagle, supra, 13 N.J.Tax at 257. Atlantic City’s expert did use the comparable sales approach as a secondary value indicator to his conclusions of value under the income approach. By his own admission, however, there were too many variables between the sales he identified and the Subject Property to make a meaningful comparison under the comparable sales approach. For this reason and for his inability to make adjustments that would demonstrate comparability between the few casino sales that exist and the Subject Property, the court finds the comparable sales approach of Atlantic City’s expert to be of little use in making a determination of value in the present matters. This is not to say however, that the sales approach could not be an appropriate valuation method for some future casino hotel tax appeal, when more reliable and comparable sales or rental data from the market, albeit limited, may exist.
Under the income approach, the Missouri Supreme Court concluded that
[t]his approach is most appropriate in valuing investment-typo properties and is reliable when rental income, operating expenses and capitalization rates can reasonably be estimated from existing marketing conditions.
Because casino facilities are not normally leased, there are no market i-ents data on which to base a valuation, and [the casino ] property is not amenable to the income approach.
[Snider, supra, 156 S.W.3d at 347 (emphasis added).]
*101 Missouri’s case law is not unlike New Jersey’s in this regard. In Coastal Eagle, supra, 13 N.J.Tax 242, although not a casino property, the Tax Court found that “[t]he income approach is inapplicable in the valuation of property for which a rental value cannot be identified.” [30] Id. at 283.
However, in Missouri, there appears to be somewhat of an inconsistency between various court decisions. In coming to the conclusion it did concerning the inapplicability of the income approach to casino property, the Missouri Supreme Court relied upon a Missouri Court of Appeals decision in Equitable Life Assurance Society v. State Tax Commission, 852 S.W.2d 376 (Mo.App.1993), where the assessment of a 604 room Marriott Hotel pursuant to the income approach was affirmed. Under the Missouri Supreme Court decision a casino “is not amenable to the income approach” simply “[b]ecause casino facilities [while income producing] are not normally leased, [and therefore] there are no market rents data on which to base a valuation.” Snider, supra, 156 S.W.3d at 347. However, under the Missouri Court of Appeals decision upon which the Supreme Court relied in Snider, a hotel was amenable to the income approach without any more leases to measure market rents than casinos. Clearly, hotels are not normally leased either, although arguably, the room rates charged at hotels may be more in line with a short term lease. As noted above, the New Jersey Tax Court has also held that “the income approach is a viable method of appraising hotels.” Glen Pointe Associates, supra, 10 N.J.Tax at 390.
In a recent hotel tax appeal, New Jersey’s Tax Court held that:
[t]he income that the property owner received is not income from the rental of the real estate, but rather the net income of a business conducted at the facility. Therefore, the valuation of the fee simple interest in the real property by *102 capitalization of income is a more complicated exercise than it is in cases where there is a lease of real estate to the operator of a business. It requires the separation of the income attributable to the use of the realty out of the total income generated by the operation of the business before capitalization of the realty income. This process is generally treated in the discussions of going concern value and business enterprise value in The Appraisal Institute, The Appraisal of Real Estate, 27-28, 641-644 (12th ed.2001). The treatise notes that income is derived from the total assets of the business (TAB) which can include real property, tangible personalty, and intangible elements. It concludes:
In the income capitalization approach, because the capitalized income stream will most likely reflect income to TAB, all components of net operating income not attributable to the real estate must be removed. [Id. 643].
Although the treatise identifies hotel operation as a business presenting this pattern, it does not discuss particular methods for the determination of realty income, either for hotel operations or generally.
[Chesapeake Hotel, L.P., supra, 22 N.J.Tax at 526-27.]
Atlantic City argues in its post trial brief that “[a]s with any hotel, the challenge in valuing a casino hotel concerns extraction of the enterprise’s business value from the going concern value produced by capitalization of the casino hotel’s income.” While having recognized above that casino hotels are not conventional hotels, the court does generally agree that the income derived from both types of properties is similar in that it is not derived from the rental of real estate. Atlantic City cited several cases where “the tax Court has relied on and adopted the Rushmore method to extract business value and isolate the value of real property in a going concern.”[31] The Rushmore methodology was explained by the court in Chesapeake Hotel, L.P. as follows:
Rushmore considered that all payments to the entity that manages and operates the hotel constitute business income generated by the exercise of management and entrepreneurship. Accordingly, he excluded these payments in the computation of realty income subject to capitalization. In addition, Rushmore considered that a portion of the overall income was realized by the employment of furniture, fixtures, and equipment (often referred to as “FF & E”). Since these items are (generally speaking) personal property rather than real estate, the income attributable to them, under Rushmore’s method, is also excluded from realty income. Separate adjustments are made to provide for periodic replacement of the personal property *103 (the return of FF & E) and also for a yield on the investment in personal property (the return on FF & E).
[Chesapeake Hotel, L.P., supra, 22 N.J.Tax at 527-28.)
It would have been preferable to have had the benefit of all three approaches to value given the novelty of the issue before the court. However, since the court finds the sales comparison approach of Atlantic City’s expert to be insufficient to determine value, and since any determination of value under the cost approach has been denied to the court under agreement of the parties in the present matters, all that remain are the respective income approaches proffered by the experts herein. This court will not substitute its own judgment for theirs. Clearly the more reasonable course is to proceed to a determination of value under the income approach alone, particularly in view of the fact that the court is unable to discern the method by which the original assessment was determined, and since Atlantic City’s expert concluded opinions of value that do not support Atlantic City’s assessment in three of the four years under appeal.
Atlantic City has convinced this court that the best way to proceed is to apply the Rushmore methodology most recently employed in Chesapeake Hotel, L.P., supra, even though it will be the first time known to this court that the methodology will be applied to a casino hotel as opposed to a conventional hotel.
VII. The Sands’ case.
Three pervasive contentions resonate from the Sands’ case in chief as justification for a reduction of its tax assessment for each of the tax years under appeal, they are: (A) the Sands needed more hotel rooms to generate more profit, (B) the Sands could not effectively compete, and (C) the Sands was a well managed casino hotel.
The first two contentions were proffered, in significant part, by the Sands’ expert in his report and testimony. While the court finds the Sands’ expert to be competent and credible, his conclusions here concerning the relationship between more rooms and casino profit, and the Sands’ ability to compete, are not supported by the facts and data in evidence and therefore are rejected.
*104 A presumption of competent management is simply assumed by the Sands. However, the court finds that it is unresolved whether this presumption of competent management attaches to casino hotels. Irrespective of the applicability of the presumption here, the testimony of several witnesses leads the court to the conclusion that there was not competent management at the Sands for any of the tax year’s under appeal.
The court’s reasons for rejecting all three of the Sands’ contentions are as follows:
A. The relationship between more hotel rooms and casino profits.
During the public hearing on the Act (Assembly Bill 2366), held on December 15, 1976, sponsoring Assemblyman Steven P. Per-skie[32] addressed the reasoning behind the requirement of a prescribed number of hotel rooms in connection with casinos and recognized the debate for and against hotel rooms. He commented that:
[The Act] very carefully limits casino operations to certain major hotel convention facilities, “certain” being defined, ... by structure and by available facilities, in terms of the number of rooms in the hotel, in terms of the size of those rooms, in terms of the amount of convention space that is required in that facility, [and] in terms of the minimum size of the casino.
Restricting the issuance of casino licenses to major hotel and convention facilities is designed to assure that the existing nature and tone of the family resort, tourist and convention industry in New Jersey and in Atlantic City is preserved, and that casino rooms licensed pursuant to the provisions of [the Act] are always offered and maintained as an integral element of such resort, tourist and convention facilities, rather than as the industry unto themselves that they have become in other jurisdictions.
[W]e are very, very concerned about maintaining the standard of the facilities ...: the number of rooms, the size of the rooms, the amount of convention space and the size of the casino. These standards are very high. You will probably hear some complaints ... that they are too high. I don’t think they are ... [T]hey may well be, in certain eases, not high enough. You will also hear from some others *105 who want to have casinox without any hotel; they just want to stick a casino in a bar or in a nightclub. It is our fervent belief that we must effectively limit the total number of licenses in order to preserve the philosophy and the tone of the gambling in Atlantic City in the fashion that I have indicated.
[W]hat we told the people of New Jersey that we wanted for Atlantic City was not gambling, per se, not simply a gambling casino adjacent to a nightclub or to a restaurant, but rather we wanted 10,000 new first-class hotel rooms, with entertainment facilities, with restaurants, with nightclubs, with shops, that would attract conventioneers and tourists to Atlantic City.
[Assemblyman Steven P. Perskie, Public Hearing before the Assembly State Government, Federal and Interstate Relations Committee on Assembly Bill 2366 (Casino Control Act), December 15, 1976, citing Article 1 § 1b(7) of Assembly, No. 2366 introduced November 22, 1976, pp. 2-6 (emphasis added).]
Clearly, in Assemblyman Perskie’s view, the reasoning behind the requirement of hotel rooms in connection with Atlantic City’s casinos was not to maximize profits for the casino owners.
The Sands’ expert concluded in his testimony that:
[t]he more rooms you have, the more profitable you’re going to be. There’s a direct correlation between the expansion of rooms and the expansion of casino space simultaneously that create ... a muck more profitable environment
[Transcript June 1, 2005 at 94, lines 8-12 (emphasis added).]
He further testified that by building more rooms,
[when] someone stays at a casino, they’re going to spend more of their money at that casino. The more rooms you have, the more patrons you have in your facility, the more gaming revenue you’re going to get. Rooms are the key. Rooms are the drivers to success of a casino.
[Transcript June 1, 2005 at 93, lines 13-17 (emphasis added).]
While the Tax Court has observed that “casino-hotels ... [needed] to increase ... their casino space [and] ... hotel rooms ... in order to remain competitive,” Ginnetti, supra, 17 N.J.Tax at 372 (emphasis added), it did not conclude that there was a direct correlation between more casino space and rooms, and increased groan operating profit[33] (hereinafter “GOP”). Furthermore, the Tax Court in Ginnetti offered no explanation as to what it meant for a casino to remain competitive.
*106 The Sands’ expert expands upon this notion that more rooms and more casino space mean greater profits for casinos in his report. He makes a direct correlation between the Sands’ inability to expand and its financial woes in view of competitors’ expansion plans, indicating that:
[t]he Sands was ... faced with more intense competition from seven casinos adding 2,650 new rooms and the reopening of Trump World’s Fair with an additional 500 rooms for a total of approximately 3,150 rooms. In addition to more rooms, existing properties would be adding approximately 250,000 sf of gaming area. As a result the Sands operating performance took devastating hits. The facility, which at one time was operating at $50 million GOP levels, was now faced with operating performance at approximately $20 million GOP. The planned expansions essentially equate to two Taj Mahal’s.[34]
[Sands Report at 91.]
In establishing proofs before this court, it is not enough to say that because GOP increased, and the number of rooms and casino space increased, there must therefore be a correlation between the increases. Rather, it must be established by a preponderance of the evidence that the rise in GOP is the direct consequence of the increase in the number of rooms and casino space. WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 617 (Tax 1985), aff'd 9 N.J.Tax 86 (App.Div.1986). Absent that proof here, this court cannot accept the conclusion of the Sands’ expert that a correlation exists between an increase in rooms and casino space, and an increase in GOP.
The Sands expert analyzed the Atlantic City casino industry and compiled a spread sheet of industry totals using Casino Control *107 Commission[35] (hereinafter “CCC”) documents, studies made by the Sands, and some of his own studies. The data were voluminous. The Sands expert, however, chose not to include the data for the Sands or the Claridge Casino Hotel as part of his definition of the “industry.” As used by the court in this opinion, however, the terms “industry” or “industry-wide” include all twelve casino hotels existing in Atlantic City during the tax years now under appeal.
The court does not find the industry-wide data alone particularly useful since only seven of the twelve casino hotels had any significant increase in rooms along with an increase in casino area (see Appendix). While generally indicative of a rise in GOP along with an increase in rooms and casino area in Atlantic City’s casino hotels over a period of years (i.e. 1989 to 1999),[36] on an industry-wide basis the data do not establish any correlation between increased profits and room/casino expansion, nor do they account for under or over performing casino hotels. There were mom than 1,100 additional rooms in 1996 than in 1995 and yet industry-wide GOP went down to pre-1993 levels. The explanation for this discrepancy offered by the Sands’ expert is that 1995 was a particularly good year for the Atlantic City gaming industry, and 1996 was an abnormally bad year. By 1997, however, there were nearly 2,500 more rooms than there were in 1995, and yet 1997 GOP fell way short of 1995 levels. Furthermore, room numbers industry-wide were stagnant in 1998 and declined by more than 500 in 1999, and yet there were increases in GOP in each of those years. Overall, there were 1,952 more rooms in 1999 than there were in 1995, and yet GOP in 1999 was still short of the 1995’s high.
The court finds that the relationship of each individual casino hotel’s GOP to any expansion of casino area and rooms provides a *108 more accurate method of evaluating the existence of any alleged correlation. After undertaking such evaluations, the court concludes that the supporting data do not demonstrate any correlation between an increase in rooms and casino space, and increased profitability of casino hotels. In fact, in almost every instance, the data support just the opposite. The following four examples support the court’s conclusion:
At Bally’s Grand, the casino area was increased from 46,297 sq. ft. in 1994 to 58,124 sq. ft. in 1995, and the total number of rooms increased in 1997 to 801, from a total of 454 rooms in 1996. GOP did increase in 1995 when the casino area increased, but in 1997, despite the larger casino and an additional 347 rooms, GOP at Bally’s Grand decreased ($30,720,000 GOP in 1996 to $29,935,000 GOP in 1997). In fact by 1999, Bally’s Grand with a GOP of $49,417,000, a slightly larger casino area (59,832 sq. ft.), and 804 rooms, failed in six out of seven years to meet 1992’s GOP of $53,308,000 with just 518 rooms, and only 45,442 sq. ft. of casino area.[37] Moreover, GOP per room in 1997, 1998, and 1999 never exceeded GOP per room, in any year from 1989 to 1994 with nearly 300 fewer rooms and about 12,000 less sq. ft. of casino area.
At the Tropicana, the casino area increased over several years from 90,774 sq. ft. in 1993 to 117,453 sq. ft. in 1999. The total number of rooms increased in 1996 to 1,624, from a total of 1,020 rooms in 1995. In 1996, despite the additional 604 rooms and about 8,000 more sq. ft. in casino area (at that time), GOP at the Tropicana decreased significantly ($73,963,000 GOP in 1995 to $58,718,000 GOP in 1996). The Sands’ expert would again explain that 1995 was an unusually good year in the gaming industry and 1996 was a particularly bad year. The fact remains, however, that the Tropicana did not see GOP levels exceed 1995’s level until 1998 with 604 more rooms and more than 22,000 sq. ft. of additional casino area. Furthermore, even with increasing GOP at the Tropicana in 1998 and 1999, GOP per room in 1996, 1997, 1998, *109 and 1999 never exceeded 1990’s GOP per room, with 610 fewer rooms and between 9,000 and 26,600 less sq. ft. of casino area.
At Caesar’s, GOP decreased from $120,713,000 in 1996 (the “bad year” industry-wide) to $104,905,000 in 1997 with 588 additional rooms and 8,000 more sq. ft. of casino area over 1995. While overall GOP increased at Caesar’s in 1998 and 1999, GOP per room in 1997, 1998, and 1999, seldom or barely achieved pre-1995 GOP per room levels when there were nearly half as many rooms, and between 15,600 and 50,500 less sq. ft. of casino area. Furthermore, it is worth noting that in the “bad” casino industry year of 1996, Caesar’s GOP actually increased by about $8,000,000 over 1995 (one of the best years industry-wide), despite the fact that the data shows Caesar’s had 82 fewer rooms in 1996 than it did in 1995, but 11,000 more sq. ft. of casino area.
Finally, at Trump Plaza, there were two instances where the total number of rooms decreased significantly and yet there was an increase in GOP. Total rooms dropped from 932 in 1992 to 557 in 1993[38] and yet GOP increased nearly $12,000,000 from $60,291,000 in 1992 to $72,027,000 in 1993, with no change in the casino area. It happened again when the total number of rooms decreased from 1,404 in 1998 to 904 in 1999. GOP nevertheless increased $1,071,000 from $81,059,000 in 1998, to $82,130,000 in 1999. More significantly, the GOP increased despite a dramatic reduction of more than 52,000 sq. ft. of casino area. Trump Plaza saw an increase in GOP after 177 new rooms were added in 1995 and 663 more rooms were added in 1996. However, when Trump Plaza nearly doubled its room capacity in 1991 by adding 500 new rooms, GOP went down by 4.3 million dollars from the previous year, with no change in the casino area.
The data for the remaining Atlantic City casino hotels reveal further inconsistencies with the conclusions of the Sands’ expert. The court’s analyses of those casino hotels can be found in the Appendix beginning at page 144.
*110 Furthermore, the court also examined the data to compare GOP with the total number of available rooms. Unlike the above analysis where the physical number of rooms was compared to GOP, this comparison measures GOP in relation to the total number of available rooms each night over a year, adjusting for new rooms that became available for occupancy during the course of a year, but not for the full year. This analysis reveals virtually the same findings as above. The court also compared total rooms and total available rooms with room occupancy rates and again found no correlation between increased hotel rooms or occupancy, and increased GOP.
Moreover, if in fact “[r]ooms are [indeed] the key ... to [the] success of a casino” as the Sands’ expert claims, then the court finds it highly inconsistent that the Sands, when it finally had the opportunity to expand in 2000, decided to build a five bay bus terminal. The new terminal provided the Sands with exposure along Pacific Avenue but no additional rooms. Several witnesses for the Sands characterized the Atlantic City market as a “day-tripper” market, meaning, as Mr. Ebling put it, the type of market where “[t]he day to day person ... would want to come and lose ... $100 eat at the buffet and go home.” In his report, the Sands’ expert indicated that “the number of visitors to Atlantic City has shown no significant growth from 1992 and 1999.” [39] Sands Report at 38. While he contends “[t]he more rooms you have, the more patrons you have in your facility,” it is clear from the Sands’ data that despite several casino expansions, there was essentially the same number of people visiting Atlantic City as there was when the casino hotels had a few thousand less rooms available. Atlantic City remained a day-tripper market regardless of significant casino hotel expansions. In the court’s view the Sands acquiesced to this reality by building a bus terminal; an odd choice nevertheless, given Mr. Tuthill’s testimony that:
*111 every customer is important to some degree, even a bus customer who is minimally profitable brings some revenue to the bottom line.
[Transcript May 5, 2005 at 91, lines 17-19 (emphasis added).]
While it is clear that the Sands’ earlier plans to build 500 more rooms in 1996[40] were scrapped for financial considerations,[41] no evidence was presented indicating that the Sands ever contemplated building additional rooms at the time the bus terminal was added. Accepting arguendo the financial constraints the Sands faced before and after filing for bankruptcy protection, if rooms were in fact the key to the Sands future success, logic dictates that the Sands’ expansion plans would have included at least some new rooms; they did not.
Accordingly, the court finds that neither the Sands’ expert nor the data upon which he relied has established “a direct correlation between the expansion of rooms and the expansion of casino space simultaneously that create ... a much more profitable environment” or that “[r]ooms are the key ... [and] ... the drivers to success of a casino.” Furthermore, the court also rejects his conclusion that “[a]s a result [of 3,150 new rooms and 250,000 sq. ft. of new gamming space] the Sands operating performance took devastating hits.”
B. The ability to compete.
The issue of the Sands ability to compete in the Atlantic City casino hotel market is replete with contradictions between the report and testimony of the Sands’ expert, prior statements made by the Sands, and the arguments put forth by the Sands’ attorney, at trial and in the Sands’ post trial brief.
The Sands’ expert wrote in his report that:
*112 [s]ince 1989 the Sands has been experiencing a decline in GOP due to changes in the competitive environment that have significantly affected their ability to maintain earnings.
The revenue decline is attributable to the inability of Sands to compete in the Atlantic City market due to its size, inferior layout, and design.
[Sands Report at 116 (emphasis added).]
On a number of occasions during the testimony of the Sands’ expert he reiterated what he wrote in his report, i.e. that the Sands could not compete. Furthermore, it is acknowledged in the Sands’ post trial brief that the Sands’ expert “may have on several occasions used a phrase in the nature of ‘the Sands cannot compete.’ ”
Among the reasons offered in support of his conclusion that the Sands could not compete, the Sands’ expert also cited, what he termed, the “inferior location” of the Sands off the Boardwalk with no access (at that time) to Pacific Avenue. He pointed to the Sands’ inability to expand, while several of its competitors were adding more rooms and more casino space. The Sands’ expert further indicated that, “[i]n terms of size, the typical standard room at the Sands is smaller” than almost every other casino property he observed. He also stated that rooms in the new additions were “clearly larger.”
In its annual reports filed pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934[42] (generally known and hereinafter referred to as “Form 10-K”), the Sands’ view on the ability to compete was sharply different than what its own expert’s report and testimony would suggest. It has been held that:
Form 10-K is submitted to the SEC for the benefit of all current and potential investors and the public at large.
[Abella. v. Barringer Resources, Inc., 260 N.J.Super. 92, 101 n. 3, 615 A.2d 288 (Ch.Div.1992).]
The SEC’s reporting requirement is designed to provide investors with the information necessary to make informed decisions, and provides the SEC with a basis to police the actions of companies subject to the requirement. See, e.g., SEC v. IMC lnt'l, Inc., 384 F.Supp. 889, 893-94 (N.D.Tex.), aff'd 505 F.2d 733 (5th Cir.1974), cert. denied, 420 U.S. 930, 95 S.Ct 1131, 43 L.Ed.2d 402 (1975). [Id. at 103, 615 A.2d 288.]
*113 The Sands’ Form 10-K report for the fiscal year ending December 31, 1994, was signed by the required officers on March 23, 1995. The following passage is what the Sands itself had to say about competition just six months before the October 1, 1995 assessment date for the first tax year in issue:
In this highly competitive environment, each property’s relative success is affected by a great many factors that relate to its location and facilities. These include availability and number of parking facilities, hotel accommodations, proximity to the Boardwalk, proximity to other casino/hotels, and access to the main express entering into Atlantic City.
[Sands 1994 Form 10-K at 4]
Despite “this competitive environment,” the Sands believed and reported that:
[I]ts operating strategy and facilities will continue to enable it to compete effectively against most other Atlantic City casino/hotels, many of which have greater sources of funding for capital improvements and financial resources for marketing and promotional budgets than [the Sands].
[Ibid, (emphasis added).]
In its 1995 Form 10-K report signed on March 28, 1996 (about six months after the first assessment date, and six months before the second one), the Sands essentially repeated the above cited passages with one significant change. Instead of reporting that “its operating strategy and facilities will continue to enable it to compete effectively against most other Atlantic City casino/hotels” [Sands 1994 Form 10-K at 4], this time the Sands reported that “its operating strategy and facilities have enabled it to compete effectively against most other Atlantic City casino/hotels.” [Sands 1995 Form 10-K at 4 (emphasis added).] The language changes back again in the 1996 Form 10-K (signed March 27, 1997) to “will continue to enable it to compete effectively ” [Sands 1996 Form 10-K at 4 (emphasis added).]
In the 1997 Form 10-K report (signed March 27, 1998), the Sands reported the filing for relief under Chapter 11 of the Bankruptcy Code, and cited its competitors’ “greater sources of funding for capital improvements and financial resources for marketing and promotional budgets” as the reason why “the Sands’ facilities and amenities have fallen behind many other casinos.” [Sands 1996 Form 10-K at 3^4.] Still, the Sands summed up its ability to compete in prior years by reporting that “in the past its operating strategy and facilities have enabled it to compete effec *114 tively against most other Atlantic City casino/hotels.” Id. at 4 (emphasis added). The Sands’ belief in its ability to compete in the past was repeated in its 1998 Form 10-K report signed on April 14, 1999, some six and one half months after the final assessment date in this matter {i.e. October 1, 1998). Each Form 10-K report for the 1994, 1995, 1996, 1997, and 1998 fiscal years were provided by the Sands and admitted into evidence.
When questioned by the court at trial about the inconsistencies between the Form 10-K reports and his opinion that the Sands could not compete, the Sands’ expert responded, “the 10K can say whatever it wants to say, but the facts are what they are. They [i.e. the Sands] didn’t compete.” [Transcript June 9, 2005 at 115, lines 18-19.]
At trial, the Sands’ attorney addressed the competition language the court cited from the Form 10-K reports arguing that:
I don’t disagree that [the Sands] could compete, okay ... It doesn’t say, though, that they’re going to outpace the market. It doesn’t say they’re going to keep up rath the growth in the market and it doesn’t say that they’re not going to be hurt by ... changes in the market, okay. And that’s the nuance difference that I think is important to understand.
[Transcript June 9, 2005 at 119, lines 7-23.]
He further notes in the Sands’ post trial brief, that “it was not Tthe expert’s] intent to convey as his opinion that the Sands cannot compete at all,” and indicated that “[the expert’s] choice of words at various times could have been better.”
The court observes, however, that inherent in this post trial argument now offered by the Sands, i.e. that its expert never meant to suggest the Sands could not compete at all, is a recognition that the Sands did not perform to expectations. Contrary to the Sands’ interpretation of the Form 10-K statements, to compete effectively[43] denotes the ability to achieve an objective. The Sands’ argument suggests that since the Sands made a profit it was therefore able to compete effectively. To accept this reasoning would mean that the objective the Sands sought to achieve was *115 to minimize its profits. Clearly such an objective is not supported by the GOP projections contained in the Sands’ operating plans for the years under appeal. Therefore when the Sands indicated in its Form 10-K reports over several years that it could, did or will be able to compete effectively, it could not have simply meant the ability to perform at some or any level, but rather it meant the ability to keep pace with the industry. Whether it actually achieved that level of performance is of little consequence.
Furthermore, since the language in the competition section of the Form 10-K reports changed from year to year, it is clear that consideration was given to the preparation of those reports, and that the language used therein was not simply boiler plate. The court agrees with Atlantic City that “[t]hese statements by [the] Sands in certified, public documents submitted to the SEC clearly conflict with the opinion of [its expert] and undermine his opinion that the Sands could not compete.” Accordingly, the court finds that the conclusion of the Sands’ expert that the Sands could not compete is in conflict with the language of Sands’ Form 10-K reports which indicates that it could, did or will be able to compete effectively. Furthermore, the court finds that the Sands’ argument to the contrary is not supported by the record.
The court also observes that the Form 10-K reports were not the only instances when the Sands represented it could compete in the face of increased competition. At the court’s request pursuant to N.J.S.A. 5:12-74, the CCC provided the transcript of the Sands’ operating license renewal hearing held on September 19, 1996.[44] During direct testimony, Mr. Ebling indicated he reviewed CCC hearings and minutes to see what the competition was doing, and testified at length about this particular CCC hearing [See Tran *116 script May 4, 2005 at 50-56], specifically acknowledging that as part of the licensing proceeding, the CCC was compelled by statute to look at the financial stability of the entity seeking the license [Transcript May 4, 2005 at 52, lines 1-5.] The court takes judicial notice of the September 19, 1996 CCC transcript of the Sands’ licensing renewal hearing since transcripts of CCC hearings qualify as public records under the hearsay exceptions. See N.J.R.E. 803(c)(8); and see N.J.S.A. 5:12-74.
During the renewal hearing, Sands President Leonard M. DeAngelo, having been duly sworn, was asked the following question:
[R]ight now there’s a proposal on the table to start construction of a casino not too far from [the Sands] between [the Sands] and the Boardwalk ... [W]hat impact will that have on your revenues?
[Public Meeting No. 96-18 Transcript at 134, lines 4-9.]
Mr. DeAngelo, just eleven days before the October 1, 1996 assessment date for the 1997 tax year’, responded as follows:
Actually, we are welcoming the development of a neighboring property which is now an empty parking lot and really doesn’t provide any extra marketing or any extra bodies, if you will, into the park area.

I think a first class property on that site would be a welcome addition, and we look forward to it.

[Public Meeting No. 96-18 Transcript at 134, lines 10-17, (emphasis added).]
Based upon Mr. DeAngelo’s answer, it doesn’t appear that the Sands was too concerned about more competition or the ability to compete in the face of that new competition.
The court is convinced that the Sands was able to compete during each of the tax years now under appeal. The Sands clearly believed it was able to compete and said so time and time again while also acknowledging the expansions in total rooms and casino space of its competitors. The Sands should not now be allowed to retreat from its earlier representations in an attempt to explain or justify the significant decline in its GOP beginning in 1996. The court finds that the inability to compete was not the reason for that decline.
*117 C. Management.
The Sands points out in its post trial brief that “[o]ur courts have held that there is a presumption of competent management and that the burden rests with the municipality to prove otherwise” citing Glen Pointe Associates v. Teaneck, supra, 10 N.J.Tax at 390, Westmount Plaza v. Twp. of Parsippany, 11 N.J.Tax 127, 131 (Tax 1990), Prudential Insurance v. Parsippany-Troy Hills, 16 N.J.Tax 58, 62 (Tax 1995), and Equitable Life Assurance v. Town of Secaucus, 16 N.J.Tax 463, 467 (App.Div.1996).[45] The Sands further points out that the Appellate Division in Equitable Life Assurance, supra, 16 N.J.Tax at 467 held that “the burden of establishing by convincing evidence that a subject property is badly managed ... is so great that there is no reported tax case in New Jersey where a court has found bad management.”[46]
All of the cases the Sands cited however, involve hotel properties; none involve casino hotel properties. The Sands in its brief, simply assumes the presumption applies to casino hotels but fails to establish that it does, or offer an argument why it should. The court notes that it was the Sands’ expert, who highlighted the differences between casino hotels and conventional hotels which the court, in part, relied upon in concluding in Part IV B above, that the two types of properties were in fact not the same.
This court is not convinced there can be a presumption of competent management at a casino hotel given that, according to the Sands’ expert, “revenue and profits in a casino hotel are far more volatile than in a conventional hotel since casino operations involve elements of luck, seasonality and the sheer magnitude of the dollars.” Sands Report at 138. Perhaps with casino hotels *118 there are degrees of competent management. The fact remains that neither party provided the court with enough of a basis to conclude whether or not the presumption applies to casino hotels. Accordingly, the court declines to make that determination here, however, it will nevertheless indulge arguendo the Sands’ assumption that it applies.
Overcoming this presumption of good or competent management was addressed in a case involving an apartment building. There the court held that:
While good management is presumed, G & S Co. v. Eatontown Bor., 2 N.J.Tax 94, 98 (Tax Ct.1980), aff'd 6 N.J.Tax 218 (App.Div.1982), the high vacancy rate, the substantial deferred maintenance and the high ratios of expenses to income all rebut this presumption.
[Si* Cherry Hill v. Cherry Hill, 7 N.J.Tax 120,133 (Tax 1984).]
In Laneco Three v. Township of Franklin, 17 N.J.Tax 233, 250 (Tax 1998), where the income approach was used to value a shopping center, the municipality argued that a persistent pattern of bad management negatively impacted on the rentals and overall value of the shopping center. However, a presumption of good management was not discussed.
According to Mr. Ebling, when the management team of William P. Weidner, Bradley Stone, and Robert Goldstein left the Sands in November 1995, “there was some negative impact from them leaving.” [Transcript May 25, 2005 at 103, lines 3-4.] Weidner, Stone, and Goldstein were replaced by Leonard DeAnge-lo who remained at the Sands until he was terminated by the Board of Directors (according to the testimony) around the second week of January 1997. Mr. DeAngelo served as President of the Sands during the fateful year of 1996, when GOP dropped so low that the Sands was never able to fully recover, and which ultimately led to bankruptcy in January 1998.
During the Sands license renewal hearing before the CCC on September 19, 1996, Mr. DeAngelo was asked “were there any factors that were unique in 1996 that adversely affected the Sands on a[GOP] basis?” He responded as follows:
Yes, there were. There were approximately three general factors, two of which could be considered industry factors and a third that was unique to the Sands.
*119 The first being the severe winter storms of the first quarter, particularly in January and February. They severely impacted revenue throughout Atlantic City as well as the Sands, and as a result of that revenues were down significantly during the first quarter.
Following ... those severe winter storms, we as an industry also experienced ratcheting up, if you will, of marketing expenses, particularly the most publicly discussed being that of the bus programs which got as high as $30 a passenger during periods of time in the second quarter, and in the first quarter as well, which on a property like the Sands which is very intensely marketed and very dependant on day traffic and has been an aggressive marketer historically clearly affected our marketing operating expenses during that time frame.
The third factor which was unique to the Sands was an unfortunate string of extremely bad luck as it related to craps, and that was directly related to our experiment with ten times odds which can be considered a failed experiment at this point in time.
We were in intense marketing wars for market share on all fronts at that point in time. We reacted to other properties putting in ten Limes odds and did not have a very good experience with it, it impacted our table percentages over two percent, almost two and a half percent during that time frame.
[Sept. 19, 1996 CCC Hearing Transcript at 116-17, lines 1-25, 1-10.]
Mr. Tuthill[47] testified in the present matters about the Sands’ experiment with ten times odds explaining that with ten times odds, “the odds reduce the advantage on the pass line bet, because they are paid on odds ... We ran ten times odds, along with one other property in town ... [which ] abandoned it long before [the Sands j did.” [Transcript May 5, 2005 at 82, lines 16-19; Id. at 83, lines 11-15 (emphasis added).] Mr. Tuthill concluded, “[i]twas very risky.” [48] [Transcript May 5, 2005 at 84, line 3 (emphasis added).]
An explanation as to why the Sands would resort to such a “risky” measure like ten times odds and allow it to go on as long as it did, was offered by Mr. Ebling in direct testimony. Mr. Ebling characterized the casino business in Atlantic City as “Ex *120 tremely competitive” [Transcript May 3, 2005 at 119, line 5], and further stated (citing William Weidner) that in the Atlantic City gaming market, “sometimes you can only be as smart as your' dumbest competitor,” id. at 119, lines 8-12, indicating that:
[i]f your competitor who is right across the street from you decides to hand out $100 bills on the boardwalk, you may have to go up on the boardwalk and stand next to him or her and hand out $100 bills no matter how much it kills you because retaining market share is cheaper than attracting or gaining market share. In Atlantic City, I can walk across the street and see what my competitor’s doing ... That’s a blessing but it might be a curse because it could be a stupid thing [they’re] doing and if I’m going to match the stupid thing, then I’m in just as much trouble as what they are.
[Id. at 119, lines 12-18, Id. at 119-20, lines 24-25, 4-7.]
The court determined just how “risky” the decision to go with ten times odds was to the Sands by calculating the estimated loss in GOP (and revenue). Before getting to the court’s calculation, however, it is necessary to first define a number of terms. The term “table game drop” means:
the sum of the total value of currency, coin, coupons other than match play coupons and 50 percent of the total value of match play coupons, the total amounts recorded on issuance copies of Counter Checks removed from a drop box, and the total of the amounts recorded on documents that evidence the exchange of gaming chips or plaques as part of credit or debit card chip transactions.
[N.J.A.C. 19:45-1.1]
The term “table hold” is:
[a] term used in the gaming industry to indicate how much of the [table game] drop is retained (won) by the game operator through the course of the play ... often ... called “win.”
[Harold L. Vogel, Entertainment Industry Economics: A Guide for Financial Analysis 430 (Cambridge University Press 1988).]
Finally, the term “table hold percentage” is:
[table hold] expressed as a percentage of the [table game] drop ...

[Ibid.]

According to Mr. DeAngelo, ten times odds “impacted ... table [hold] percentages over [2%], almost [2.5%],” through the end of the third quarter of 1996 (when he testified before the CCC). The data provided by the Sands’ expert shows that in the seven years from 1989 through 1995, the Sands’ table hold percentage never fell below the industry average more than 0.2%, and either met or exceeded the industry average in four of the seven years. The *121 Sands’ actual table hold percentage for 1996 was just 13.7% while the industry’s average that year was 15.5%. By simply applying the industry average of 15.5% in place of the Sands’ actual 1996 table hold percentage (which would be a lower percentage than adding “over [2%]” estimated by Mr. DeAngelo, to the actual 13.7%), it becomes clear just how costly the decision to institute ten times odds was to the Sands’ 1996 table hold (or win). The result is an estimated loss in GOP (and revenue) of approximately $10,300,000. The Sands total GOP in 1996 was only $15,634,000. The courts calculations are as follows:
(1) Actual 1996 Figures & Calculation:
$576,577,000 (table game drop)
x 13.7% (table hold percentage)
$ 79,072,000 (table hold/win)[49]
(2) Increase the actual 13.7% table hold percentage to the 1996 industry average of 15.5% table hold percentage:
$576,577,000 (table game drop)
x 15.5% (table hold percentage)
$ 89,369,435 (table hold/win)
(3) IIow much the Sands lost in GOP and revenue 1996:
$ 89,369,435 (table hold or win @ 15.5%)
-8 79,072,000 (actual 1996 table hold/win)
$ 10,297,435 (say $10,300,000 Lost GOP and Revenue)
The court could have utilized more than a 15.7% table hold percentage which would have been consistent with Mr. DeAngelo’s CCC testimony, and would have resulted in a greater loss in GOP and revenue. The court could have ignored Mr. DeAngelo’s CCC testimony altogether, and simply used the number Mr. Ebling testified to in the present matters i.e. that the “1996 budgeted hold percentage [was] 15.8 percent” [Transcript May 25, 2005 at 89, lines 17-18], which would have resulted in a still greater loss in *122 GOP and revenue. For purposes of this illustration, however, the court used the more conservative 15.5% table hold percentage which is the actual 1996 Atlantic City casino industry average, and consistent with the Sands’ past table hold percentage history. As a result of ten times odds the Sands lost an estimated $10.3 million dollars in GOP.[50]
The experience' with ten times odds had significant and long term effects on the Sands. The planned expansion to build 500 more rooms at the Sands announced in June of 1996 had to be scrapped. The Sands never recovered from the losses sustained in 1996; eventually in 1998, the Sands filed for bankruptcy protection. Mr. DeAngelo called what happened with ten times odds “an unfortunate string of extremely bad luck.” Perhaps it should more appropriately be called “convincing evidence that a subject property is badly managed.” Equitable Life Assurance, supra, 16 N.J.Tax at 467.
However, the experience with ten times odds is just one factor in the assessment of the competency of the Sands’ management. One bad management decision alone, or a good decision that doesn’t quite work out as hoped, is not enough to overcome the presumption of competent management assumed here. Accordingly, the court will also consider the other factors to rebut the presumption set forth in Six Cherry Hill v. Cherry Hill, supra. These include a high vacancy rate, substantial deferred maintenance, and high ratios of expenses to income. In Six Cherry Hill v. Cherry Hill, supra, these factors were applied to an apartment building. In the present matters, since the presumption of good management is being assumed by the court, the same factors will be applied to a casino hotel with some necessary modifications.
Casino hotels don’t have vacancy rates in the same manner as apartment complexes or office buildings. However, statistics are maintained on occupancy rates for the hotel portion of casino hotels and would be the most analogous comparison to vacancy *123 rates in rental properties. Information on occupancy rates at the Atlantic City casino hotels was provided by the Sands’ expert. The occupancy rates at the Sands reveal that after 1992 the Sands occupancy rate was below the industry average in every year except 1994 and 1995. This is most apparent in the year 1998 when the Sands occupancy rate was the lowest since 1987, and far off the average of its competitors in the Atlantic City casino market.
There has also been substantial deferred maintenance at the Sands, despite the detailed Capital Improvement History set forth by the Sands’ expert in his report. While the Capital Improvement History indicates that renovations or upgrades of rooms occurred during 1995,1996, and 1997, Mr. Ebling testified that “as of ... 1995, the standard rooms had not been renovated in terms of replacement of the casement or hard goods since opening of the casino.” [Transcript May 25, 2005 at 49, lines 24-25; Id. at 50, lines 1-3.] Furthermore, during the Sands bankruptcy proceeding, Mr. Kraus verified in a Verified Motion for Order Authorizing Debtor to Implement Room Renovation Plan, etc.,[51] before the Bankruptcy Court, dated March 4,1998, that:
... the Sands’ hotel is in need of substantial renovation. The hotel portion of the Sands was built in 1979-80 and, excluding renovations of a limited number of suites and rooms, last was the subject of a major rooms renovation more than a decade ago. The majority of the Sands’ 530-plus rooms therefore have not been renovated for an extended period of lime, and thus, renovations are required. A substantial investment in draperies, linens, wall and floor coverings and furniture .. is needed to bring' the hotel rooms back to the level required to remain competitive in the fiercely competitive Atlantic City market.
[Ibid.]
The Bankruptcy Court granted the motion. Given the testimony of Mr. Ebling and the verification of Mr. Kraus, it is clear that the Sands neglected maintenance of rooms well before 1996. Furthermore, the court finds it to be highly inconsistent for the Sands’ expert to now contend that “[r]ooms are the drivers to success of a casino ” [Transcript June 1, 2005 at 93, line 17 (emphasis added)], *124 when the Sands’ management failed to regularly maintain the rooms in the years before bankruptcy.
Additionally, the Sands’ ratio of expenses to net revenue exceeded the average of the Atlantic City casino industry every year from 1990 to 1999. More specifically, for the relevant tax year's, the Sands ratio of expenses to net revenue ranges from 9.9% to 13.66% higher than the industry average, with the highest disparity coming in 1999. Atlantic City’s expert concluded that an appropriate ratio of expenses to net revenue ranged from 83% to 84.5% for the tax years under appeal. The Sands exceeded this range every year since 1995. The expense to net revenue ratio for each year is addressed more fully in Section VII of this opinion.
There was also testimony at trial and discussion in both experts’ reports concerning the management agreement between the Sands and New Jersey Management, Inc. (hereinafter “NJMI”).[52] Such agreements are permitted under N.J.S.A. 5:12-82, and the NJMI agreement was approved by the CCC. Atlantic City’s expert indicated in his report that for the years 1993 to 1997, the management agreement allowed the payment of management fees ranging from 1.75% to 2.37% of net revenues, “which were well below the market norm.” AC Report at 138. While the cost of the agreement was within acceptable levels, exactly what the Sands was getting for the management fee, and not necessarily the fee itself, became the overriding issue with regard to the management agreement. NJMI was a subsidiary within the corporate conglomerate that owned the Sands as well. In fact, Mr. Kraus indicated that the Boards of both the Sands’ operating company and NJMI were essentially the same.[53] Clearly Mr. *125 Ebling and Mr. Kraus believed that the management agreement added little or no value to the Sands. Theoretically, the amount of the management fee ($4,644,000 in 1996, $5,430,000 in 1997, and $2,388,000 in 1998) would have remained within the Sands’ revenue. It is likely, however, that even without the agreement, there would have been some expenses associated with management. After much internal strife within the Sands organization, the management agreement was finally terminated by the Sands’ Board of Directors in May 1998.[54]
If a presumption of competent management applies to casino hotels, then the foregoing analysis demonstrates to the court through convincing evidence that the presumption has been overcome and that the Sands was “negatively impacted” from “a persistent pattern of bad management.” See Laneco Three, supra, 17 N.J.Tax at 250. This finding of bad management includes the 1996 tax year, even though the often praised management team of Weidner, Stone, and Goldstein, was still at the helm of the Sands on the first assessment date of October 1, 1995, and there were no apparent negative affects of any bad management at that time. Weidner, Stone, and Goldstein, however, must bear part of the responsibility for the deferred room maintenance during their tenure, as well as the high expense ratio, and declining occupancy rates. By not addressing these issues when times were better for the Sands, they in essence had sewn the seeds for future disaster, when the decisions and policies of their successors assured the Sands’ downward spiral that eventually led to bankruptcy.
The court also finds bad management for the 1997 and 1998 tax years. By the October 1, 1996 assessment date, the devastating experiment with ten times odds (not simply the decision to give it a try, but rather allowing it to go on as long as it did) can be added to the deferred maintenance, the high expense ratio and the *126 still declining occupancy rate. By the October 1,1997 assessment date, the Sands position had become tenuous and its ability to resolve its problems speculative. Yet, the Sands continued to pay a management fee of questionable value and benefit that shifted money away from its own casino hotel to other entities within the corporate conglomerate that owned it.
For tax year 1999, the affairs of the Sands were essentially under the purview of the Bankruptcy Court as of the October 1, 1998 assessment date, and therefore any significant decisions affecting the Sands had to meet with that court’s approval. However, the Bankruptcy Court is clearly not in the business of managing casinos. .While the Sands’ management made the prudent decision to file for bankruptcy protection in January of 1998, high expenses persisted, room occupancy in 1998 was one of the lowest in the Sands’ history, and room maintenance continued to suffer for most of the year, despite the Sands’ successful petition to the Bankruptcy Court to renovate the rooms.
Accordingly, the court finds that the Sands suffered from bad management as of the assessment dates for tax years 1996, 1997, 1998 and 1999.
VIII. Determination of Value.
Since the court in the preceding section has rejected each of the Sands’ contentions for reducing its tax assessment, accordingly the court cannot accept the opinions of value concluded by the Sands’ expert for any of the years under appeal as they are substantially predicated upon facts and conclusions which have been rejected.
The court finds that Atlantic City’s expert provided a generally more reliable and well founded basis for determining value under the income approach. The court reiterates, however, that his opinions of value in the later three tax years do not support the original assessments. While this creates an unusual predicament for Atlantic City, which, in the present appeals, is sometimes a plaintiff theoretically seeking to increase the Sands’ assessment, and other times is a defendant defending the assessment, the court does not find these circumstances to be irreconcilable.
*127 With regard to the Sands’ revenue and expenses for the relevant tax years, the court generally looked to the data provided by the Sands’ expert and compared it to the revenue and expenses projected by each expert. Atlantic City’s expert analyzed the performance of other casino hotels in Atlantic City which he found to be most comparable to the Subject Property and based his conclusions on that analysis. Where the Sands’ expert often accepted a previous year’s actual results as the stabilized revenue and expense projections for the Subject Property in the relevant tax years, Atlantic City’s expert used a more in-depth analysis in arriving at his stabilized revenue and expense projections which the court generally found more persuasive in view of the “persistent pattern of bad management” (Laneco Three, supra, 17 N.J.Tax at 250) that was found, in Section VII of this opinion, to have hampered the Sands’ performance for the relevant tax years.[55]
However, not all of the conclusions of the Sands’ expert are without merit. As will be apparent under each year’s value determination, the court accepts some of the projections of revenue and expenses of the Sands’ expert in several instances where there was not significant disagreement with Atlantic City’s expert, and where the Sands’ expert’s projections were found to be reasonable and more persuasive. The court also accepts the *128 deduction of the Sands’ full investment made to the Casino Reinvestment Development Authority[56] (hereinafter “CRDA”) advocated by its expert, as opposed to Atlantic City’s expert’s deduction of only the CRDA interest.
The Sands’ expert concluded an overall capitalization rate of 11.5% for each of the relevant tax years. Atlantic City’s expert concluded an overall capitalization rate of 10.1% for 1996, 10% for 1997 and 1998, and 9.75% for 1999. To their overall capitalization rates both experts added the effective tax rate of 2.83% for 1996, 3% for 1997, 2.76% for 1998, and 3.01% for 1999. The Sands’ adjusted capitalization rate is 14.33% for 1996, 14.5% for 1997, 14.26% for 1998, and 14.51% for 1999. Atlantic City’s adjusted capitalization rate is 12.93% for 1996, 13% for 1997, and 12.76% for 1998 and 1999.
The court’s determinations of value for each tax year are as follows:
A. Tax Year 1996.
On the revenue side, the data show that in 1994, casino revenue rose industry-wide 3.79% over 1993, and in 1995, it rose 9% over 1994. At the Sands, the data show that casino revenue rose 4.6% over 1993, and in 1995, it rose 3.06% over 1994. The court concludes that a 3% increase in 1996 revenue over 1995 revenue is reasonable. As of October 1, 1995, there was no indication that the winter of 1996 would be as severe as it turned out to be, or would affect the Atlantic City casino industry to the extent that it did. The Atlantic City casino industry had an extremely active and profitable year in 1995 and there was no credible evidence indicating that 1996 wouldn’t have been just as prosperous for the industry. Accordingly, the court’s projected casino revenue for 1996 is $271,969,000. By comparison, Atlantic City’s expert projected $270,000,000 in casino revenue; the stipulated actual 1996 total gaming revenue i.e. casino revenue was *129 $264,048,000. However, in the Sands 1996 operating plan (admitted in evidence as AC-14), the total 1996 casino revenue is projected at $280,510,000, representing a 6.2% increase over 1995, more than double the rate of increase concluded by the court.
The data show that food & beverage revenue in 1995 increased industry-wide 6.46%, and at the Sands 10.98%, over 1994, yet the Sands’ expert projected no additional increase in 1996. The court finds however, that estimating a modest 2% increase in 1996 for food & beverage revenue is reasonable and conservative. This would result in an increase from 1995’s $33,029,000 to a projected $33,690,000 in 1996. The court’s projection is not only lower than what Atlantic City’s expert projected, but also lower than the 12% increase the Sands’ projected in its 1996 Operating Plan.
With regard to room and other revenue, the court accepts the lower projections provided by the Sands’ expert as the data show downward trends in both categories. Compiling the total 1996 projected revenue based on the forgoing conclusions, the court’s total projected revenue is $319,071,000. Atlantic City’s expert came to an amount nearly identical to the court’s at $319,000,000. The Sands’ expert projected total revenues to be $306,568,000 in 1996, significantly lower than the overall 6.9% increase or $332,048,000 that the Sands had projected in its 1996 Operating Plan.
Both experts arrived at different projections for promotional allowances. The Sands’ expert simply used the same amount for 1996 as 1995 which equates to a 0% increase; Atlantic City’s expert figured about a 17.8% increase in 1996 over 1995. Industry-wide, the data show a 10.16% increase in 1995 over 1994, and a 10.63% increase in 1996 over 1995. The court finds that a 3% increase which equates to $27,895,000 is reasonable. The court’s projection is closer to what the Sands’ projected in its 1996 Operating Plan. Furthermore, the Sands’ actual increase in promotional allowances in 1996 was 3.12% according to the data.
Subtracting promotional allowances from total revenue, the court’s projected net revenue for 1996 is $291,176,000. This number represents about a 2.74% increase over the Sands 1995 *130 net revenue. The data indicate that industry-wide net revenue increased 3.3% in 1994, and 7.98% in 1995. At the Sands, net revenue increased 4.88% in 1994, and 3.2% in 1995. Furthermore, the Sands projected a 6.8% increase in net revenue in its 1996 Operating Plan, which would have equated to $302,664,000 in 1996 net revenue. By comparison, the court’s projected increase in net revenue for 1996 is more conservative and reasonable.
As for expenses, the Sands’ expert in several instances simply used the actual 1995 figure as a projection for 1996. One instance in which he did not adopt the actual figure was with 1995’s cost of goods sold (Atlantic City’s expert calls it costs & services). Here, the Sands’ expert projected a 3.26% increase over 1995. According to the Sands’ data, the industry increase in 1995 over 1994 was 4.1%; the increase at the Sands during the same time period was 2.32%. Atlantic City’s expert had a much higher increase; however, the court is unclear as to exactly what expenses he included in this category. The court finds Sands’ projection to be reasonable and more persuasive in view of the past performance of the industry in general and the Sands in particular.
For expenses related to selling, general & admin., the Sands’ expert used the $104,005,000[57] actual 1995 figure as a projection for 1996. The 1995 figure, however, was by far the highest in the history of the Sands. The 1996 actual figure was $97,075,000 which equated to a 6.66% decline from 1995. Atlantic City’s expert projected $86,100,000 for expenses related to selling, general & admin., a number that equates to an 8.7% decline from 1995. The court projects a 4% decline from the 1995 high which equates to $99,844,000, a number the court finds to be consistent with the Sands’ data.
For doubtful accounts.,[58] the data illustrate a downward trend beginning in 1994 with an 8.88% decline over the previous year, *131 and continuing in 1995 with an 8.99% decline over 1994. The court finds a 10% decline as a projection for 1996 to be consistent with the trend of the previous two years (the actual 1996 decline was 27.48%). The Sands’ expert simply used 1995’s actual; Atlantic City’s expert projected a number that was higher than the court’s number, but more consistent with the downward trend.
The court projects a total of $239,724,000 in expenses or 82.33% of the court’s determined net revenue of $291,176,000. The total expenses were then deducted from the net revenue to arrive at a projected 1996 GOP for the Sands of $51,452,000. The court’s result is consistent with the determination of Atlantic City’s expert that an 83% expense to net revenue ratio is appropriate. The ratio between expenses and net revenue utilized by the Sands’ expert for tax year 1996 was 87.38%. However, in its 1996 Operating Report, the Sands utilized an 84.1% expense ratio (expenses of $254,556,000 to net revenue of $302,664,000), which is closer to the 83% expense ratio that Atlantic City’s expert deemed appropriate. Had the Sands utilized an 83% expense ratio in its 1996 Operating Report, its projected GOP would have been $51,452,880, nearly identical to the court’s projection of $51,452,000.
The management fee was calculated pursuant to the stipulation of the parties. The CRDA deduction was calculated pursuant to N.J.S.A. 5:12-144.1(a)(2). While both determined that the CRDA investment was $1,111,000, the Sands’ expert deducted the entire amount, while Atlantic City’s expert deducted only the interest amounting to approximately $80,000 to $90,000. The court finds the Sands’ deduction to be reasonable and more persuasive since it reflects the total CRDA cost to the Sands.
For return on inventories and interest on casino bank, the court finds the number determined by the Sands’ expert to be reasonable and more persuasive. While the parties stipulated to a reserve allowance of $7,350,000 for FF & E and short-term life real estate, the allocation of that amount was provided by the *132 Sands’ expert. The court finds that allocation to be reasonable, and incorporates that number under replacement allowance, return of FF & E, and real estate reserves!defense capital. After making these additional deductions, the net real estate income before real estate taxes is $38,117,000.
The Sands’ expert concluded an overall capitalization rate, before the effective tax rate, of 11.5%. Atlantic City’s expert concluded the overall capitalization rate to be 10.1%. The court finds that an overall capitalization rate of 10.5% adequately reflects the nature and risk involved in the operation of a casino hotel in view of the management problems that persisted at the Sands. To the overall capitalization rate the court adds the effective tax rate of 2.83% for an adjusted capitalization rate of 13.33% (or 0.1333).
Applying the adjusted capitalization rate of 13.33% (or 0.1333) to the net real estate income before real estate taxes of $38,117,000, the capitalized value is $285,950,340. The parties stipulated to the value of FF & E (personal property) at $24,850,000. When the FF & E value is deducted from the capitalized value of $285,950,340, the court finds that the value of the real estate portion of the Subject Property as of October 1, 1995 for tax year 1996 is $261,100,340. This value falls between the values concluded by both experts but is closer to the $270,000,000 value determined by Atlantic City’s expert.
The court’s determined value of $261,100,340 is greater than the $261,092,000 original assessment of the Subject Property, and the assessment to true value ratio of 99.99% is below the upper limit of the common range (i.e. 108.62%, or 100%). Accordingly, the judgment of the Board reducing the assessment is reversed and the original assessment for the 1996 tax year is affirmed and hereby reinstated.
The court’s calculation of value is as follows:
Income Approach for Tax Year 1996 in '000s
Revenues
$271,969 Casino
$ 9,602 Rooms
*133 Pood and Beverage $ 33,690
Other $ 3,810
Total $319,071
Less: Promotional Allowance ($ 27,895)
Net Revenues $291,176
Expenses
Cost of Goods Sold ($ 137,190)
Selling, General, & Admin ($ 99,845)
Provision for Doubtful Accounts ($ 2,689)
Total ($289,724)
Gross Operating Profit (GOP) $ 51,452
Add Back:
Real Estate Taxes $ 7,815
Adjusted Net Operating Income $ 59,267
Less Business Investment Deductions
Management Fee (incl. Franchise Fee) ($ 11,647)
Replacement Allowance ($ 5,000)
Return on FF & E _$_0_
Return on Inventories ($ 640)
Interest on Casino Bank ($ 402)
Total — Business Investment Deductions ($ 17,689)
Net Income Before Real Estate Taxes $ 41,578
Other Deductions
Real Estate Reserves / Defense Capital ($ 2,350)
CRDA Investment / Expenses ($ 1,111)
Total — Other Expense Items ($ 3,461)
Net Real Estate Income
Before Real Estate Taxes: $ 38,117
*134 Net Real Estate Income Before Real Estate Taxes $ 38,117
Overall Rate 10.50%
Total Effective Tax Rate 2.83%
Adjusted Capitalization Rate 0.1333
Capitalized Value $ 285,950
Deduct Value of FF & E (personal property) ($ 24,850)
Value of Real Estate $ 261,100
B. Tax Year 1997.
The parties stipulated that $264,048,000 was the actual total gaming revenue, i.e. casino revenue, for 1996. In so stipulating, the parties took the actual 1995 casino revenue and adopted it for 1996. By accepting $264,048,000 as 1997’s projected casino revenue, the court is projecting a 0% increase in casino revenue over the previous year. The Sands’ data shows that industry-wide, casino revenue rose 1.53% in 1997 over 1996. Accordingly, a 0% increase is more conservative. As for the other areas of revenue, there was little difference between the experts. The court accepts the revenues projected by the Sands’ expert for rooms, food and beverage, and other, as they appear to be reasonable and more persuasive projections. The court arrives at total projected 1997 casino revenue of $313,849,000.
There was about a $4,000,000 discrepancy between the experts with regard to promotional allowances. The court accepts the higher number concluded by Atlantic City’s expert (i.e. $31,900,000) as it seems reasonable that after a “bad” year like 1996, more in the way of promotional allowances would be necessary to try to generate more revenue. Subtracting promotional allowances from total revenue, the projected 1997 net revenue is $281,949,000. In its 1997 Operating Plan (admitted in evidence as AC-15), the Sands projected 1997 net revenue of $281,333,000, about the same as the court’s projection here.
On the expense side, there was a significant difference between the experts in the selling, general, & admin, category. Both *135 projected that the downward trend will continue although they were about $17,000,000 apart in their projections. The actual decline at the Sands from 1995 to 1996 was 6.66%, and 14.08% from 1996 to 1997. The court finds that continuing the downward trend with a projected 7% decline is reasonable. Accordingly the court finds that $92,856,000 is an appropriate projection for 1997’s selling, general, & admin, expenses.
There was little difference between the experts for costs of goods sold and doubtful accounts. The court finds the projections of the Sands’ expert to be reasonable and more persuasive. Accordingly, the court’s total projected expenses for 1997 are $233,608,000. This represents 82.85% expense to revenue ratio; not far from Atlantic City’s expert’s conclusion of an 83.5% expense ratio for 1997.
After determining GOP of $48,341,000 (net revenue of $281,949,000 less total expenses of $233,608,000), the court accepts all of the remaining projections of the Sands’ expert for 1997, that were not already stipulated to by the parties, as reasonable and more persuasive. The management fee and the CRDA investment were recalculated pursuant to the parties’ stipulation and the new numbers are reflected in the court’s calculation of value below. The court finds no need to alter the 10.50% overall capitalization rate; although the adjusted capitalization rate increases to 13.5% (or 0.135) in view of the increase of the effective tax rate to 3%.
As calculated below, the court finds the value of the real estate of the Subject Property as of October 1, 1996 for tax year 1997 to be $237,722,000. The court’s conclusion of value is supported by Atlantic City’s expert who found the 1997 value to be $239,000,000. Since this value as determined by the court is below the assessed value of $261,092,000, the presumption of validity of the original assessment has been overcome. Furthermore, since the 1997 average ratio exceeds 100%, the court shall set the assessment at the true value of $237,722,000. The court’s calculation of value is as follows:
*136 Income Approach for Tax Year 1997 in '000s
Revenues
Casino $264,048
Rooms $ 9,446
Food and Beverage $ 34,638
Other $ 5,717
Total $313,849
Less: Promotional Allowance ($ 31,900)
Net Revenues $281,949
Expenses
Cost of Goods Sold ($ 138,585)
Selling, General, & Admin ($ 92,856)
Provision for Doubtful Accounts ($ 2,167)_
Total ($233,608)
Gross Operating Profit (GOP) $ 48,341
Add Back:
Real Estate Taxes $ 7,809_
Adjusted Net Operating Income $ 56,150
Less Business Investment Deductions
Management Fee (inch Franchise Fee) ($ 11,278)
Replacement Allowance ($ 5,000)
Return on FF & E $ 0
Return on Inventories ($ 581)
Interest on Casino Bank ($ 427)
Total — Business Investment Deductions ($ 17,286)_
Net Income Before Real Estate Taxes $ 38,864
Other Deductions
Real Estate Reserves / Defense Capital ($ 2,350)
CRDA Investment / Expenses ($ 1,080)
Total — Other Expense Items ($ 3,430)
*137 Net Real Estate Income
Before Real Estate Taxes: $ 85,434
Net Real Estate Income Before Real Estate Taxes $ 35,434
Overall Rate 10.50%
Total Effective Tax Rate 3.00%
Adjusted Capitalization Rate 0.135
Capitalized Value $ 262,472
Deduct Value of FF & E (personal property) ($ 24,750)
Value of Real Estate $ 237,722
C. Tax Year 1998.
The parties stipulated that 1997’s actual casino revenue was $242,889,000 (which was, in fact, the true casino revenue for 1996). Atlantic City’s expert projected 1998 casino revenue at $242,000,000. The court finds that lower number projected by Atlantic City’s expert is more reasonable and persuasive, as well as more conservative than simply accepting 1997’s stipulated actual casino revenue as the projected casino revenue for 1998.
Under the same reasoning of the 1997 tax year, the court accepts the remaining revenue projections of the Sands’ expert for rooms, food and beverage, and other, as they are reasonable projections, and since there is little difference with Atlantic City’s expert. The court’s projected total revenue is $288,782,000.
The court also accepts the promotional allowance concluded by the Sands’ expert. While an increase in, or at least the same level of, promotional allowances may be justified under the reasoning for accepting the higher number in 1997, since the testimony indicated there was a higher amount of cash promotions at the Sands, it is reasonable and more persuasive to the court that lower projected revenues equates to less available cash for promotions. Deducting the promotional allowance from the total revenue, the net revenue is $263,782,000.
*138 On the expense side, Atlantic City’s expert projected total expenses of $217,000,000 for selling, general, & admin., costs of goods sold and doubtful accounts. This figure represents about 82.3% of net revenues and is consistent with his determination that the 1998 expenses ratio should be about 83.5%. The Sands’ expenses totaled $227,886,000 or about 86.4% of net revenues; a considerably higher ratio. The court therefore accepts the expenses of Atlantic City’s expert as more reasonable and persuasive.
After determining GOP of $46,782,000 (net revenue of $263,782,000 less total expenses of $217,000,000), the court accepts all of the remaining projections of the Sands’ expert for 1998, that were not already stipulated to by the parties, as reasonable and more persuasive. The management fee and the CRDA investment were once more recalculated pursuant to the parties’ stipulation and the new numbers are reflected in the court’s calculation of value below. The court again finds no need to alter the 10.50% overall capitalization rate; although the adjusted capitalization rate decreases to 13.26% (or 0.1326) in view of the decrease of the effective tax rate to 2.76%.
As calculated below, the court finds the value of the real estate of the Subject Property as of October 1, 1997 for tax year 1998 to be $240,605,000. The court’s conclusion of value is supported by Atlantic City’s expert who found the 1998 value to be slightly lower at $239,500,000. Since this value as determined by the court is below the assessed value of $261,092,000, the presumption of validity of the original assessment has been overcome. The court will apply the 1998 average ratio of 94.10% to the determined true value and accordingly will adjust the assessment to $226,409,000.[59] The court’s calculation of value is as follows:
Income Approach for Tax Year 1998 in '000s
Revenues
Casino $242,000
*139 Rooms $ 9,691
Food and Beverage $ 32,968
Other $ 4,123
Total $288,782
Less: Promotional Allowance ($ 25,000)
Net Revenues $263,782
Expenses
Cost of Goods Sold ($ 136,400)
Selling, General, Admin ($ 78,000)
Provision for Doubtful Accounts ($ 2,600)
Total ($217,000)
Gross Operating Profit (GOP) $ 46,782
Add Back:
Real Estate Taxes $ 7,650
Adjusted Net Operating- Income $ 54,432
Less Business Investment Deductions
Management Fee (inel. Franchise Fee) ($ 10,551)
Replacement Allowance ($ 5,000)
Return on FF & E $ 0
Return on Inventories ($ 506)
Interest on Casino Bank ($ 355)
Total — Business Investment Deductions ($ 16,412)
Net Income Before Real Estate Taxes 38,020
Other Deductions
Real Estate Reserves / Defense Capital ($ 2,350)
CRDA Investment / Expenses ($ 988)
Total — Other Expense Items ($ 3,338)
Net Real Estate Income
Before Real Estate Taxes: $ 34,682
*140 Net Real Estate Income Before Real Estate Taxes $ 34,682
Overall Rate 10.50%
Total Effective Tax Rate 2.76%
Adjusted Capitalization Rate . 0.1326
Capitalized Value $ 261,555
Deduct Value of FF & E (personal property) ($ 20,950)
Value of Real Estate $ 240,605
D. Tax Year 1999.
For tax year 1999, Atlantic City’s expert projected casino revenue in the amount of $234,400,000. The Sands’ expert projected $219,368,000 which is the stipulated actual casino revenue for 1999. In the Sands 1999 Operating Plan (admitted in evidence as AC-17), casino revenue is projected at $228,917,000. The Sands’ own projection is more conservative than the projection of Atlantic City’s expert, and, in the court’s opinion, more reliable than the projection of the Sands’ expert. The court accepts $228,917,000 as projected casino revenue for 1999. The court also accepts the remaining revenue projections of the Atlantic City’s expert for rooms, food and beverage, and other, as they appear to be reasonable and more persuasive projections, since they trend upward which is supported by the Sands’ data. The court determines that total revenue is $275,817,000.
For the same reasons as stated for tax year 1998, the court accepts the lower projection for promotional allowances concluded by the Sands’ expert in the amount of $20,372,000. Subtracting the promotional allowances from total revenue, the court arrives at $255,445,000 in net revenue.
As a percentage of net revenue, there was virtually no difference between each expert’s expense projections for selling, general, & admin., costs of goods sold and doubtful accounts. The ratio of expenses to revenue was in the 83% range for both, close to where Atlantic City’s expert concluded the 1999 expense ratio *141 should be at about 84.5%. Atlantic City’s expenses where slightly higher (ie. 83.34% of net revenue) and, when deducted from net revenue would result in a conclusion more favorable to the Sands. Accordingly, the court accepts the total expenses of Atlantic City’s expert at $212,900,000.[60]
After determining GOP of $42,545,000 (net revenue of $255,445,000 less total expenses of $212,900,000), the court accepts all of the remaining projections of the Sands’ expert for 1999, that were not already stipulated to by the parties, as reasonable and more persuasive. Once again the management fee and the CRDA investment were recalculated pursuant to the stipulation of the parties and the new numbers are reflected in the court’s calculation of value below. The court still finds no need to alter the 10.50% overall capitalization rate; however, the adjusted capitalization rate increases to 13.51% (or 0.1351) as the effective tax rate increases to 3.01%.
As calculated below, the court finds the value of the real estate of the Subject Property as of October 1, 1998 for tax year 1999 to be $208,867,000. The court’s conclusion of value is supported by Atlantic City’s expert who found the 1999 value to be not significantly higher at $211,500,000. Since this value as determined by the court is below the assessed value of $261,092,000, the presumption of validity of the original assessment has been overcome.
Furthermore, since the 1999 average ratio exceeds 100%, the court shall set the assessment at the true value of $208,867,000. The court’s calculation of value is as follows:
Income Approach for Tax Year 1999 in '000s
Revenues
Casino $228,917
Rooms $ 9,400
*142 Food and Beverage $ 32,800
Other $ 4,700 '_
Total _$275,817
Less: Promotional Allowance ($ 20,372)_
Net Revenues $255,445
Expenses
Cost of Goods Sold ($132,300)
Selling, General, Admin ($ 78,100)
Provision for Doubtful Accounts ($ 2,500)
Total ($212,900)
Gross Operating Profit (GOP) $ 42,545
Add Back:
Real Estate Taxes $ 7,856
Adjusted Net Operating Income $ 50,401
Less Business Investment Deductions
Management Fee (incl. Franchise Fee) ($ 10,218)
Replacement Allowance ($ 5,000)
Return on FF & E _$_0_
Return on Inventories ($ 510)
Interest on Casino Bank ($ 395)
Total — Business Investment Deductions ($ 16,123)_
Net Income Before Real Estate Taxes $ 34,278
Other Deductions Real Estate Reserves / Defense Capital ($ 2,350)
CRDA Investment / Expenses ($ 934)
Total — Other Expense Items ($ 3,284)
Net Real Estate Income
$ 30,994 Before Real Estate Taxes:
*143 Net Real Estate Income Before Real Estate Taxes $ 30,994
Overall Rate 10.50%
Total Effective Tax Rate 3.01%
Adjusted Capitalization Rate 0.1351
Capitalized Value $ 229,417
Deduct Value of FF & E (personal property) ($ 20,550)
Value of Real Estate $ 208,867
Atlantic City shall submit computations pursuant to the court’s determination herein as permitted by R. 8:9-3, allocating the new assessments for tax years 1997, 1998, and 1999, among the various lots that comprise the Subject Property. If the Sands disputes the proposed computations the court will resolve the dispute pursuant to R. 8:9-4.
The Clerk of the Tax Court shall enter judgment in accordance with this opinion.

*144
Appendix

Chart A: Block and Lot Numbers and Descriptions for Tax Years 1996,1997, & 1998
[[Image here]]
Chart B: Block and Lot Numbers and Descriptions Tax Year 1999
[[Image here]]
*145 Chart C: Original Assessments 1996,1997,1998» & 1999
[[Image here]]
*146 Chart D: Allocation of the 1996 Atlantic County Tax Board Judgment[61]
[[Image here]]

Evidence

The court admitted in evidence Sands’ exhibits marked Sands-1 through Sands-17, Sands-19 through Sands-34, Sands-36 through Sands-61, Sands-63 through Sands-73, and Atlantic City’s exhibits marked AC-1, AC-3 through AC-25, AC-29, AC-31 through AC-34, AC-36, AC-37, AC-40 through AC-46, AC-49, AC-51, *147 AC-52, AC-55, AC-56, AC-62 through AC-68(a), AC-69, AC-75 through AC-77, AC-79 through AC-85.
The following exhibits were admitted in evidence for a limited purpose: Sands-35 was limited to establishing the history of attempts made by the Sands to acquire the Bala-Midtown Hotel property; AC-38 was limited to the chart entitled Inter-company Relationships Chart (exhibit D-416:); AC-39 was limited to the history of licensing proceedings, upstream of payments, etc. for the Casino Control Commission; AC-53 and AC-54 were limited to pages the witness testified to on cross examination; AC-70 was limited to the first three pages; and AC-71, AC-72, AC-73 and AC-74 were limited to information pertaining to 1993 and afterward.
Sands-18, Sands-62, AC-2, AC-26, AC-27, AC-28, AC-30, AC-35, AC-47, AC^8, AC-48(a), AC-50, AC-57, AC-58, AC-59, AC-60, AC-61, AC-68(b), AC-78 and AC-86, were excluded from evidence.

Definitions utilized in Section V.

Simule,asting Facility: ‘‘A facility established in a casino hotel pursuant to section 4 of the ‘Casino Simulcasting Act,’ P.L.1992, c. 19 (C.5:12-194).” N.J.S.A. 5:12-44.1.

Slot Machine:

[ajny mechanical, electrical or other device, contrivance or machine which, upon insertion of a coin, token or similar object therein, or upon payment of any consideration whatsoever, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator or application of the element of chance, or both, may deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash, or to receive merchandise or any thing of value whatsoever, whether the payoff is made automatically from the machine or in any other manor whatsoever ...
[N.J.S.A. 5:12-45.]

Table Games:

[Any]of the following authorized games approved by the LOCC] pursuant to N.J.S.A. 5:12-5: baccarat, big six, blackjack, boston 5stud poker, Caribbean stud poker, casino war, colorado hold’em poker, craps, double attack blackjack, double cross poker, double down stud, fast action hold’em, four card poker, let it ride poker, minibacccarat, mini-craps, mini-dice, pai gow, pai gow poker, poker, pokette, red dog, roulette, sic bo, Spanish 21, texas hold’em bonus poker and three card poker.
[N.J.A.C. 19:40 — 1.2(b).]
Keno Booths: Although not separately defined in N.J.A.C. 19:45-1.47, it can be generally discerned from the regulation that
*148 a physical structure known as a keno booth ... [houses] the keno witters and ... [serves] as the central location for ... 1. [t]he custody of keno booth inventory, including currency, coin, coupons, gaming chips, slot tokens, and forms and documents normally associated with the operation of a keno booth; [and] 2. [t]he exchange by patrons of coupons for currency, coin or keno tickets ...
[N.J.A.C. 19:45-1.47(b)1 to -2.]

Additional data on roomlcasino area increases and GOP.

At Bally’s Park Place, the data indicates a total increase of 69 rooms between 1990 and 1992, with a 1,400 sq. ft. increase in casino area during that time. In his report, the Sands’ expert claims that all of the projects he included in the 2,650 new rooms were approved and constructed after 1993. Aside from this timing discrepancy, even though Bally’s Park Place’s GOP increased in 1992 over the two previous year's, GOP was lower in 1992 than it was in 1989 when there were only 940 reported rooms. Furthermore, it took until 1995 for GOP per room at Bally’s Park Place to exceed the 1989 level when there were 329 fewer rooms and 11,400 less sq. ft. of casino area. There was a significant increase in casino area between 1996 and 1999, from 71,380 sq. ft. to 120,284 sq. ft. respectively. GOP increased each year' in 1997, 1998, and 1999, without any corresponding increase in rooms. In fact, for each of those year's, the total number of rooms either remained the same as the previous year, or decreased slightly.
At Harrah’s, GOP increased through 1999, after 414 new rooms were added in 1997. However, GOP per room at Harrah’s in 1997 and 1998 never achieved the level of any prior year going back to 1989 with 414 fewer rooms. GOP per room in 1999 exceeded 1997 and 1998 levels, but failed to exceed prior levels of GOP per room in five out of the eight years prior to 1997, when there were 414 fewer rooms. Casino area at Harrah’s increased between 1996 and 1999, an additional 16,500 sq. ft. to 20,580 sq. ft. over 1995.
At the Showboat, GOP generally increased in the years after 1994 when nearly 300 rooms were added (making a total of 1,174 rooms), and casino area was increased by about 15,000 sq. ft. However, the increase in GOP was not steady from year to year; in fact, in 1996, 1997, and 1999, GOP decreased from the previous year but still exceeded GOP levels prior to room and casino expansion. Furthermore, in only half of years following the 1994 *149 expansion, (specifically 1995, 1996 and 1998), does GOP per room exceed the level of GOP per room in 1993.
At the Taj Mahal, the Claridge, Resorts, Trump Marina, and the Sands, there was some casino expansion but only inconsequential increases in total rooms to make any meaningful comparison to GOP.

 As a result of corporate restructuring, several years subsequent to the tax years under appeal, title was vested in ACE Gaming, LLC, the substituted plaintiff herein.

 On motion by the Sands to transfer Atlantic City's 1997 appeal to the Board, the Tax Court determined that it had jurisdiction without regard to which pleading was filed first. See City of Atlantic City v. Greate Bay, 16 N.J.Tax 486 (Tax 1997), aff'd 304 N.J.Super. 457, 701 A.2d 458, 17 N.J.Tax 101 (App.Div. 1997); see also Create Bay v. City of Atlantic City, 21 N.J.Tax 122, 128 (App.Div. 2003) (recognizing that the "municipality could have unilaterally defeated the County Board's jurisdiction by the simple expedient of filing its own ... tax appeal in the Tax Court.").

 United States Bankruptcy Court, District of New Jersey, In re: Great Bay Hotel and Casino, Inc., et al, Case No. 98-10001(JW), Chapt. 11.

. See A.H. Robins Co. v. Dir., Div. of Taxation, 20 N.J.Tax 338 (Tax 2002) (setting forth the different circumstances under which a statute may be preempted by federal law).

 United States Bankruptcy Court, District of New Jersey, In re: Great Bay Hotel and Casino, Inc., et al, Case No. 98-10001(JW), Chapt. 11; Adversary Proc. Nos. 98-1123, 98-1124, 98-1126 through 98-1134, and 98-1125, ORDER GRANTING THE CITY OF ATLANTIC CITY'S MOTION FOR ABSTENTION FROM AND REMAND OF THE ADVERSARY PROCEEDINGS, etc., November 4, 1998.

 For tax year 1999, the Air Rights Parcels were assessed separately but the total assessment did not change (see Chart C in the Appendix).

 According to Mr. Kraus's testimony, Ed, Bill, and Jack Pratt “were the majority [of the] board of directors [of] the operating company and the management company." [Transcript May 23, 2005 at 61, lines 18-23.]

 The Sands’ expert indicated that the new parking garage provided for 1,850 additional spaces, bringing the total number of spaces to 2,250. Atlantic City's expert makes no mention of the original 400 space parking garage but indicates that the new parking garage has a total parking capacity of 1,738 spaces which is the number to which the parties stipulate in Section V.

 The enabling legislation was L. 1977, c. 110, § 1, eff. June 2, 1977, as subsequently amended. Resorts International opened its doors in May 1978.

 Note that under Nevada law, "[t]he computed taxable value of any property must not exceed its full cash value ... [a] person determining whether taxable value exceeds that full cash value or whether obsolescence is a factor in valuation may consider: (a) Comparative sales, based on prices actually paid in market transactions!;] (b) A summation of the estimated full cash value of the land and contributory value of the improvements!; and] (c) Capitalization of the fair economic income expectancy or fair economic rent, or an analysis of the discounted cash flow." Nev.Rev.Stat. Ann. 361.227(5) (2005) (emphasis added). Note further that "[t]he 1980 version of NRS 361.227(1) directed the assessor to compute taxable value by using three methods — cost, market and income approaches [to value].” Imperial Palace, Inc. v. Nevada, 108 Nev. 1060, 1068, 843 P.2d 813 (1992) (citations omitted).

 In Imperial Palace, Inc., supra, the court reaffirmed that the assessor was required by NRS 361.227(1)(b) to appraise improvements on real property "by subtracting from the cost of replacement of the improvements all applicable depreciation and obsolescence." Id. at 1064, 843 P.2d 813. The court noted that ”[t]he dispute ... [in that case centered] on the County and State [Tax] Boards' method of determining cost of replacement," id. at 1065, 843 P.2d 813, and not on a contention "that the taxable value of the [Imperial] Palace improvements exceeded their full cash value.” Id. at 1064, 843 P.2d 813.

 In Indiana,
real property is assessed on the basis of its “true tax value.” “True tax value” does not mean fair market value, but rather “the market value-in-use of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property.”... [T]he primary method for Indiana assessing officials to determine a property's value-in-use is the cost approach. To that end, Indiana ... has promulgated a series of guidelines that explain the application of the cost approach in detail.”
[Fidelity Federal Savings & Loan v. Jennings County Assessor, 836 N.E.2d 1075, 1080-81 (Ind.Tax2005) (citations omitted).]

 This sentence is not contained in the 10th edition (1992) of The Appraisal of Real Estate, and was removed from the 12th edition. But see International Valuation Standards, Sixth Edition 2003, § 3.0 Definitions, § 3.2 Limited Market Property, "The central distinguishing characteristic of limited market properties is not that they are incapable of being sold in the (open) market, but that the sale of such properties commonly requires a longer marketing period than is common for more readily saleable properties.”

 Compare the 10th edition (1992) of The Appraisal of Real Estate, at 23 (emphasis added), “There is generally a continuum between market properties and limited-market properties"; and the 11th edition (1996) of The Appraisal of Real Estate, supra, at 25, “There is not generally a clear distinction between market properties and limited-market properties.”

 In Snider v. Casino Aztar/Aztar Missouri Gaming Corp., supra, 156 S.W.3d at 348, the Missouri Supreme Court determined that Aztar’s casino property was a special use properly and therefore found the application of the comparable sales approach to value was not appropriate.

 The statute provides that the term "casino" may be used interchangeably with the terms "casino room” or "licensed casino." N.J.S.A. 5:12-6.

 Both terms may be used interchangeably with the term “establishment." N.J.S.A. 5:12-19.

 The court notified counsel for the parties on the record that it might consider using portions of Mr. Vogel's book in this opinion, and provided them with the pertinent excerpts and the opportunity to respond in writing.

 "In 1995, the casino gaming industry reported between $22 and $25 billion in total revenues, $16.3 billion of which was derived specifically from casino gaming activities." Arthur Anderson, Economic Impacts of Casino Gaming in the United States, Volume I: Macro Study 17 (1996) (prepared for the American Gaming Association). [Note: The court notified counsel for the parties on the record that it might consider using portions of the Arthur Anderson Study in this opinion, and provided them with the pertinent excerpts and the opportunity to respond in writing]. See also Harold L. Vogel, Entertainment Industry Economics: A Guide for Financial Analysis 248 (Cambridge University Press 1988).

 According to the report of the Sands’ expert, "[a]s of each valuation date, there were twelve casino hotels operating [in Atlantic City], generating around $4 billion to $5 billion a year.” Sands Report at 25. According the report of Atlantic City's expert, “Nevada and New Jersey casinos alone, accounted for $11.07 billion of revenue in 1996, and $4.2 billion of revenue in 1982, a 163% increase over the 14 year period." Id. at 36; see also Harold L. Vogel, Entertainment Industry Economics: A Guide for Financial Analysis 248 (Cambridge University Press 1988).

 The floors are numbered from one to twenty-one, however, there is no designated thirteenth floor.

 All listed amenities were completed for all four tax years under appeal.

 An expansion project in 2000 after the acquisition of the adjoining Bala Hotel site provided the Sands with access to Pacific Avenue, but not for the tax years under appeal herein.

 Since neither party offered any separate designation of keno area or revenue, the court infers that the keno booths for tax years 1996 through 1998, were included within either the casino or the simulcasting facility as provided by ..." N.J.A.C. 19:45-1.47B, and that the keno booths were already accounted for in the parties' stipulated total gaming area, and the revenue generated from keno is included in the stipulated total casino win.

 The term total gaming revenue (defined by counsel for the parties to include revenue from slot machines, table games, simulcasting, and keno) is not intended to be used interchangeably with the terms casino win and gross revenue, which, by definition and practice, do not include simulcasting revenue. See definition of gross revenue under N.J.S.A. 5:12-24, (providing that " 'Gross Revenue' shall not include any amount received by a casino from casino simulcasting ... ’’); see also Office of Communications, State of New Jersey Casino Control Commission, Atlantic City Gaming Industry Economic Impact Report, at 5, available at http://www. state.nj.us/casinos/fnancia/histori/docs/second_qtr_2005.xls (last visited March 2, 2006), (providing that "Casino Win reflects winnings from Slot Machines, Table Games, and Other Games as reported on the Monthly Tax Returns filed with the NJ Casino Control Commission”) [Note: Monthly Gross Revenue Tax Return form CCC-101 distinguishes "Table and Other Games Gross Revenue" and "Slot Machine Gross Revenue" from "Silmulcasting Revenue."]. But see Harold L. Vogel, Entertainment Industry Economics: A Guide for Financial Analysis 430 (Cambridge University Press 1988) (emphasis added) (providing "[f]or a casino, gross win is the equivalent to revenues or sales in other businesses. It is from that win that operating expenses must be deducted”).

 The parties agreed to accept the previous year's true casino revenue, as the stipulated actual total gaming revenue (or casino revenue) for each of the tax years under appeal. For example, $264,048,000 is the true casino revenue for 1995 according to the Sands' data, and yet that same amount is stipulated to here as 1996’s actual casino revenue. This is set forth in pre-trial stipulations by *95 letter of May 2, 2005 from Atlantic City's attorney to the court. Further clarification of these stipulations is provided in Atlantic City's post trial brief dated December 19, 2005; although there appears to be a typographical error with regard to 1996's stipulated actual casino revenue therein--the correct amount should be $264,048,000 not $264,889,000.

 In that case the Tax Court excluded tile casino's cost approach to value, not because it was inapplicable but rather because of the way it had been prepared.

 The court denied the Sands’ motion to set aside the presumption of validity.

 See Nev.Rev.Stat. Ann. 361.227(1)(b) (2005); Imperial Palace, Inc. v. Nevada, supra (Nevada); Snider v. Casino Aztar/Aztar Missouri Gaming Carp., supra (Missouri); and Majestic Star Casino, LUC v. Blumenburg, supra (Indiana).

 See also Associated Press, Mississippi Coast casinos protest local property taxes: ‘Income method’ values Beau Rivage at just $252 million, Sept. 12, 2000, (reporting that the casino officials in Harrison County claimed county supervisors erred "by using the replacement value of the hotels, instead of basing the appraisals on income), available at http:l/www.lasvegassun.com/sunbin/stories/ text/2000/sep/12/ 510754931.html (last visited Aug. 29, 2005). Note: "The casinos are technically on floating barges and considered personal property. The tax assessments affect only buildings on dry land and the land itself." Ibid.

 Glen Pointe Associates, supra, 10 N.J.Tax 380; Prudential Insurance Co. v. Parsippany-Troy Hills Tp., 16 N.J.Tax 58 (Tax 1995), aff'd 16 N.J.Tax 148 (App.Div.1996); Westmount Plaza v. Parsippany Troy Hills Tp., 11 N.J.Tax 127 (Tax 1990).

 The court notified counsel for the parties on the record that it might consider and use the December 15, 1976 transcript of the public hearing for the Act in this opinion, and provided them with the opportunity to respond in writing. The Sands submitted a general objection to the court's use of the Perskie comments; Atlantic City did not respond.

 According to Mr. Ebling, "gross operating profit" or GOP is casino industry terminolog} for EBITDA, i.e. “earnings before interest, taxes, depreciation, and amortization." [Transcript May 3, 2005 at 112, lines 1 — 5 | See also Bill Friedman, Designing Casinos To Dominate The Competition 627 (2000) (defining EBITDA).

 The analysis of the Sands' expert was limited to expansions in the first phase of the Casino Reinvestment Development Authority (CRDA) created by amendment to the Act in 1984. CRDA activities are funded by the Casino Reinvestment Tax, which requires that operating casinos invest a percentage of their gross revenues in the tax fund either through the purchase of bonds issued by CRDA, or through direct investments in or donations to, CRDA approved projects. The CRDA approved room expansions the Sands' expert reviewed were: Showboat (284 rooms), Tropicana (604 rooms), Caesar's (620 rooms), Harrah's (416 rooms), Bally's Grand (308 rooms), Bally's Park Place (69 rooms), and Trump Plaza (349 rooms). According to the Sands' expert, "[a]ll of these projects were approved between 1993 and 1995 and completed between 1994 and 1998." Sands Report at 91.

 Sec N.J.S.A. 5:12-50 to -79.

 Total rooms increased from 7,785 in 1989 to 11,356 in 1999; total casino area increased from 648,475 sq. ft. in 1989 to 1,043,171 sq. ft. in 1999; and GOP increased from $666,715,000 in 1989 to $995,315 in 1999.

 The only year that GOP at Bally's Grand exceeded 1992’s GOP was in 1995 (the exceptionally good year industry-wide, according to the Sands’ expert) when Bally’s Grant had just 509 rooms.

 The court is unable to determine how the Sands' expert arrived at the number of 349 new rooms at Trump Plaza that were approved and built after 1993.

 Visitation totals to Atlantic City provided by the Sands’ expert indicate a low of 30,225,000 visitors to a high of 34,300,000 visitors. It is noteworthy that the four highest visitation years are the four years under appeal in this matter.

 According to the Sands' expert, "Sands was approved for nearly $20 million of CRDA funding for a major expansion and, in June of 1996, announced a $150 million plan that would include an additional 500 rooms." Sands Report at 92.

 According to the Sands’ expert, "[the] drastic decline in operating performance made the acquisition of the parcels necessary to complete the project financially impossible." Sands Report at 93.

 15 U.S.C.A. §§ 78a to -78nn.

 "EFFECTIVE stresses the actual production of or the power to produce an effect." Webster’s Ninth New Collegiate Dictionary 397 (9th ed.1983). To compete is to strive for an objective. Id. at 269.

 The court notified counsel for the parties on the record that it might consider and use the September 19, 1996 CCC transcript in this opinion, and provided them with a copy of the transcript and the opportunity to respond in writing. The Sands' attorney generally objected to the court’s use of the CCC testimony, however, he indicated several additional excerpts which should also be given consideration. The court reviewed the additional testimony from the stated CCC hearing as suggested, and finds, after careful consideration, that the additional testimony is of little value and is accordingly not given much weight.

 The court notes that the presumption of good management was first discussed in G & S Co. v. Eatontown, 2 N.J.Tax 94 (Tax 1980).

 The Tax Court in fact found that the presumption had been rebutted in Six Cherry Hill v. Cherry Hill, 7 N.J.Tax 120, 133 (Tax 1984). Furthermore, the court notes that the Sands' attorney misquoted the Appellate Division. The last part of this quote should read, "bad hotel management." Equitable Life Assurance, supra, 16 N.J.Tax at 467 (emphasis added).

 At the time Mr. Tuthill was the Casino Manager at the Sands where he oversaw table games.

 The Philadelphia Inquirer reported on September 20, 1996 that " ‘Ten Times Odds,' [was] an experimental Sands crap game that turned out to be a bust for the casino. It allowed gamblers to play as much as 10 times more of their cash against the odds in a crap game than they had previously been allowed to bet. Gamblers did — and won big. During the first six months, the casino lost $19.5 million, while the rest of the city's gaming halls experienced a 3 percent increase in profits.”

 The numbers used in this calculation are consistent with the data of the Sands' expert. The court notes, however, that the calculation of the table win from the actual figures would be $78,991,049.

 In his general objection to the court's use of Mr. DeAngelo's September 19, 1996 testimony before the CCC, the Sands' attorney calculated the Sands' loss at $10.4 million.

 The motion also contained a request to purchase 800 new slot machines.

 According to Mr. Kraus's testimony, "as part of the refinancing in February 1994, Pratt Casino Management, Inc. merged into Greate Bay Hotel Corporation ... [who] changed its name to New Jersey Management, Inc.” [Transcript May 23,2005 at 128, lines 6-11.]

 According to Mr. Kraus’s testimony, "the Pratt brothers remained [on] the board of directors of NJMI [with one independent person]. The board of directors of Greate Bay Hotel & Casino were myself, Tim Ebling, and Dick Knight. The reason that the Pratt brothers resigned from the board ... [was] *125 because of a perception of a conflict of interest going into the chapter 11 proceeding.'' [Transcript May 23, 2005 at 81, lines 18-25].

 The vote was 2 to 0, with Mr. Ebling and Mr. Kraus voting to terminate and Mr. Knight abstaining.

 For each tax year beginning with 1997 through 1999, Atlantic City's expert factored in a decline in (gross and net) revenue ranging from 9.3% to 9.7%, and a decline in expenses raging from 9.3% to 9.8%. For the same time period, the Sands' expert factored in a decline in gross revenue ranging from 9.1% to 9.6%, a decline in net revenue ranging from 9.2% to 9.6%, and a decline in expenses ranging from 9.3% to 9.7%. The experts differed, however, as to when the decline in revenue should be reflected: the Sands' expert factored in a decline in revenue beginning with his 1996 projections (a 9.8% reduction from 1995'$ actual total revenue); Atlantic City's expert projected a 2.74% increase in revenue in 1996 (the industry increase was about 2.56% according to the Sands' data) with the decline beginning in 1997. The court determined that a 2.76% increase in revenue was reasonable for tax year 1996 (considering that but for the Sands' poor performance that year, the industry average would have been higher). Beginning with tax year 1997, the court's determinations of projected revenue and expenses reflect an annual decline ranging from 9.2% to 9.8%, about the same as both experts projected.

 Established by L. 1984, c. 218, § 5, eff. Dec. 19, 1984, as amended. See N.J.S.A. 5:12-153 to-183.

 He actually used $104,055,000, but his data indicate that the number was in fact $104,005,000.

 The Sands' expert explained in his report that "credit is a recognized method of promoting activity in the casino business. However, in the course of *131 extending credit, bad debts result and must be written off.” Sands Report at 130.

 The court rounded the actual number down from $240,409,305.

 The court notes that a mathematical error exists in Atlantic City's report and that this figure accurately reflects the total expenses when commutated correctly.

 There were no separate assessments for Block 26, Lots 191.01, 192.01, and 192.02 (Air Rights Parcels) for tax years 1996 through 1998 as they were merged with other lots (See Chart C). Accordingly, the Board made no separate reductions for these parcels for tax year 1996.